**TOWN OF COTTAGE CITY**
3820 40th Avenue
Cottage City, Maryland 20722,

**THE TOWN OF FOREST HEIGHTS**
5508 Arapahoe Drive
Forest Heights, Maryland 20745,

**TOWN OF NORTH BRENTWOOD**
4009 Wallace Road
North Brentwood, Maryland 20722,

**THE TOWN OF UPPER MARLBORO**
14211 School Lane
Upper Marlboro, Maryland 20772,

Plaintiffs,

v.

**ALLERGAN PLC**
Clonshaugh Business & Technology Park,
Dublin, D17 E400, Ireland,

**ACTAVIS PLC**
5 Giralda Farms
Madison, New Jersey 07940,

**ACTAVIS, INC.**
5 Giralda Farms
Madison, New Jersey 07940,

**WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.**
5 Giralda Farms
Madison, New Jersey 07940,

**WATSON LABORATORIES, INC.**
5 Giralda Farms
Madison, New Jersey 07940,

**ACTAVIS LLC**
5 Giralda Farms
Madison, New Jersey 07940,

IN THE

CIRCUIT COURT FOR

PRINCE GEORGE'S COUNTY

MARYLAND

Case No.: CAL20-08814

CLERK OF THE
CIRCUIT CO...
... -4 PM 2: ...
PR GEO CO MD ...

**ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.**
5 Giralda Farms
Madison, New Jersey 07940,
SERVE ON: Corporate Creations Network Inc.
3411 Silverside Road
Tatnall Building, Suite 104
Wilmington, Delaware 19810,

**CARDINAL HEALTH, INC.**
7000 Cardinal Place
Dublin, Ohio 43017,
SERVE ON: CT Corporation
4400 Easton Commons Way, Suite 125
Columbus, Ohio 43219,

**CARDINAL HEALTH 5, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
SERVE ON: The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 100, INC.**
7000 Cardinal Place
Dublin, Ohio 43017,
SERVE ON: The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 107, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
SERVE ON: The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 108, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
SERVE ON: The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 110, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 121, LLC**
7172 Columbia Gateway, Suite 200B
Columbia, Maryland 21045,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 122, LLC**
7172 Columbia Gateway, Suite 200B
Columbia, Maryland 21045,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 128, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 132, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH 200, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**CARDINAL HEALTH PHARMACY SERVICES, LLC**
7000 Cardinal Place
Dublin, Ohio 43017,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**TEVA PHARMACEUTICAL INDUSTRIES, LTD.**
5 Basel Street
Petach Tikva 49131
Israel,

**TEVA PHARMACEUTICALS USA, INC.**
1090 Horsham Road
North Wales, Pennsylvania 19454,
**SERVE ON:** Corporate Creations Network Inc.
3411 Silverside Road
Tatnall Building, Suite 104
Wilmington, Delaware 19810,

**CEPHALON, INC.**
1090 Horsham Road
North Wales, Pennsylvania 19454,

**ENDO HEALTH SOLUTIONS INC.**
1400 Atwater Drive
Malvern, Pennsylvania 19355,
**SERVE ON:** The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801,

**ENDO PHARMACEUTICALS, INC.**
1400 Atwater Drive
Malvern, Pennsylvania 19355,
**SERVE ON:** The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801,

**JANSSEN PHARMACEUTICALS, INC.**
1000 U.S. Route 202 South
Raritan, New Jersey 08869,
**SERVE ON:** CT Corporation System
600 North 2nd Street
Harrisburg, Pennsylvania 17101,

**ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.**
1000 U.S. Route 202 South
Raritan, New Jersey 08869,
**SERVE ON:** CT Corporation System
600 North 2nd Street
Harrisburg, Pennsylvania 17101,

**JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.**
1000 U.S. Route 202 South
Raritan, New Jersey 08869,
**SERVE ON:** CT Corporation System
600 North 2nd Street
Harrisburg, Pennsylvania 17101,

**JOHNSON & JOHNSON**
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933,

**MALLINCKRODT, PLC**
3 Lotus Park
The Causeway
Staines-Upon-Thames, Surrey TW18 3AG
United Kingdom,

**MALLINCKRODT, LLC**
3 Lotus Park
The Causeway
Staines-Upon-Thames, Surrey TW18 3AG
United Kingdom,

**SPECGX LLC**
Unknown
**SERVE ON:** The Corporation Trust, Incorporated
351 West Camden Street
Baltimore, Maryland 21201,

**JOHN KAPOOR, an individual**
6610 North 29th Place
Phoenix, Arizona 85016,

**MICHAEL BABICH, an individual**
18391 North 97th Place
Scottsdale, Arizona 85255,

**AMERISOURCEBERGEN CORPORATION**
1300 Morris Drive
Chesterbrook, Pennsylvania 19087,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**AMERISOURCEBERGEN DRUG CORPORATION**
1300 Morris Drive
Chesterbrook, Pennsylvania 19087,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**HOSPIRA, INC.**
275 North Field Drive
Lake Forest, Illinois 60045,
**SERVE ON:** The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801,

**INDIVIOR, INC.**
10810 Midlothian Turnpike
Richmond, Virginia 23235,
**SERVE ON:** Corporation Service Company
251 Little Falls Drive
Wilmington, Delaware 19808,

**MYLAN N.V.**
1000 Mylan Boulevard
Canonsburg, Pennsylvania 15317,
**SERVE ON:** Corporation Service Company
600 North 2nd Street, Suite 401
Harrisburg, Pennsylvania 17107,

**MYLAN PHARMACEUTICALS, INC.**
1000 Mylan Boulevard
Canonsburg, Pennsylvania 15317,
**SERVE ON:** CT Corporation System
1627 Quarrier Street
Charleston, West Virginia 25311,

**MYLAN INSTITUTIONAL, INC.**
1000 Mylan Boulevard
Canonsburg, Pennsylvania 15317,
**SERVE ON:** CT Corporation System
208 South LaSalle Street, Suite 814
Chicago, Illinois 60604,

**PHARMEDIUM SERVICES, LLC**
150 North Field Drive
Lake Forest, Illinois 60045,
**SERVE ON:** The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801,

**NOVARTIS PHARMACEUTICALS CORPORATION f/k/a SANDOZ, INC.**
100 College Road West
Princeton, New Jersey 08540,
**SERVE ON:** Corporation Service Company
1900 West Littleton Boulevard
Littleton, Colorado 80120,

**HIKMA PHARMACEUTICALS USA, INC. f/k/a WEST-WARD PHARMACEUTICALS CORP.**
246 Industrial Way
West Eatontown, New Jersey 07724,
**SERVE ON:** The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, Delaware 19801,

**MARYLAND CVS PHARMACY, LLC**
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**RITE AID OF MARYLAND, INC.**
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**DIMENSIONS HEALTH CORPORATION**
3001 Hospital Drive
Cheverly, Maryland 20785,
**SERVE ON:** University of Maryland Medical Sys. Corp.
Office of the General Counsel
250 West Pratt Street, 24th Floor
Baltimore, Maryland 21201,

**MEDSTAR SOUTHERN MARYLAND HOSPITAL CENTER, INC.**
7503 Surratts Road
Clinton, Maryland 20735,
**SERVE ON:** The Corporation Trust, Inc.
2405 York Road
Lutherville Timonium, Maryland 21093,

**KAISER FOUNDATION HEALTH PLAN OF THE MID-ATLANTIC STATES, INC.**
2101 East Jefferson Street
Rockville, Maryland 20852,
**SERVE ON:** The Prentice-Hall Corporation System, MA
7 St. Paul Street, Suite 820
Baltimore, Maryland 21202,

**DOCTOR'S HOSPITAL, INC.**
8118 Good Luck Road
Lanham, Maryland 20706
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**PHARMACY CORP. OF AMERICA d/b/a PHARMERICA**
12240 Kiln Court
Beltsville, Maryland 20705,

**ACCOKEEK DRUG AND HEALTH CARE, INC.**
15789 Livingston Road, Suite 108
Accokeek, Maryland 20607,
**SERVE ON:** Joseph Penzenstadler
3819 Whippoorwill Lane
White Plains, Maryland 20695,

**GIANT FOOD STORES, LLC**
1149 Harrisburg Pike
Carlisle, Pennsylvania 17013,
**SERVE ON:** CSC-Lawyers Incorporating Service Co.
7 St. Paul Street, Suite 820
Baltimore, Maryland 21202,

**SAFEWAY, INC.**
Fourth and Jackson Streets
Oakland, California 94660
**SERVE ON:** The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium, Maryland 21093,

**DOES 1 through 1000,**

Defendants.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Town of Cottage City ("Cottage City"), The Town of Forest Heights ("Forest Heights", Town of North Brentwood ("North Brentwood"), and The Town of Upper Marlboro ("Upper Marlboro") (collectively, the "Municipal Plaintiffs" or the "Towns"), by their attorneys Paul Mark Sandler, Joel I. Sher, and Eric R. Harlan, of Shapiro Sher Guinot & Sandler, P.A., and Jeffrey H. Reeves, Cheryl Priest Ainsworth, and Kevin N. Royer, of Theodora Oringher PC, sue the above captioned Defendants and state as follows:

## I. INTRODUCTION

1. Opiates[1] are killing people every day in this country and Marylanders have not been spared. Each of the Defendants in this action engaged in an industry-wide effort to downplay the addictive and deadly potential effects of the misuse of prescription opioids. The opioid epidemic has hit every community in Maryland hard, including the Towns of Cottage City, Forest Heights, North Brentwood, and Upper Marlboro in Prince George's County. The Municipal Plaintiffs bring this Complaint seeking redress for the societal and financial damage they have suffered at the hands of those directly responsible for the crisis—the manufacturers and distributors of prescription opioids.

2. This case is about corporate greed. Simply stated, each of the Defendants put its desire for profits above the health and well-being of the Municipal Plaintiffs' citizens. The Municipal Plaintiffs and its citizens have paid dearly as a result.

3. This case is not about taking away medically-necessary opioids from the patients who need them. The Municipal Plaintiffs do not ask the Court to decide whether opioids are clinically appropriate, nor do the Municipal Plaintiffs seek to blame the well-meaning healthcare providers and suppliers who prescribed opioids to their patients in good faith. Instead, the Municipal Plaintiffs only ask that this Court hold the Defendants accountable for the damage they caused to the Municipal Plaintiffs that Defendants were always in the best position to prevent.

---

[1] The term "opiate" technically refers only to chemicals that occur naturally in the opium plant, including morphine, codeine, thebaine and papaverine. "Opioid," by contrast, refers instead to compounds that have the same effect as opiates but do not occur naturally in the opium plant, such as heroin, oxycodone, hydrocodone, hydromorphone and oxymorphone ("semi-synthetic" opioids) as well as methadone, fentanyl, meperidine and tramadol ("synthetic" opioids).

### A. The Manufacturer Defendants' Two-Part Scheme to Increase Opioid Sales

4. First, as part of a broader scheme to target municipalities in the United States where the elements most conducive to opioid addiction were prevalent, Defendants ALLERGAN PLC; ACTAVIS PLC; ACTAVIS, INC.; WATSON PHARMACEUTICALS, INC. n/k/a ACTAVIS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.; MALLINCKRODT, PLC; MALLINCKRODT, LLC; SPECGX, LLC; TEVA PHARMACEUTICAL INDUSTRIES, LTD.; TEVA PHARMACEUTICALS USA, INC.; CEPHALON, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; NOVARTIS PHARMACEUTICALS CORPORATION f/k/a SANDOZ, INC.; MYLAN PHARMACEUTICALS, INC.; MYLAN N.V.; MYLAN INSTITUTIONAL, INC.; HOSPIRA, INC.; HIKMA PHARMACEUTICALS USA INC. f/k/a WEST-WARD PHARMACEUTICALS CORP;.; INDIVIOR, INC.; PHARMEDIUM SERVICES, LLC; JOHN KAPOOR, an individual; and MICHAEL BABICH, an individual ("the Manufacturer Defendants"), targeted the State of Maryland, including the citizens of the Towns. The Manufacturer Defendants developed and engaged in a sophisticated, manipulative scheme designed to increase the number of opioid prescriptions written across the state, including in the Towns. Defendants' scheme was particularly well-suited to the Towns, because they are home to many economically and medically vulnerable populations that Defendants knew were uniquely predisposed to opioid addiction, including the elderly.

5. Second, the Manufacturer Defendants dramatically increased the number of opioid prescriptions in the Towns and across the country by (1) concealing the truth about the risk of addiction and death associated with long-term use of their products, and (2) pressuring their respective sales forces to deceive (even bribe) local prescribers to flood Maryland—and the Towns—with an abundance of opioids.

**B. The Distributor Defendants Turned a Blind Eye to the Manufacturers' Scheme**

6. Defendants AMERISOURCEBERGEN CORPORATION; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CARDINAL HEALTH 5, LLC; CARDINAL HEALTH 100, INC.; CARDINAL HEALTH 107, LLC; CARDINAL HEALTH 108, LLC; CARDINAL HEALTH 110, LLC; CARDINAL HEALTH 121, LLC; CARDINAL HEALTH 122, LLC; CARDINAL HEALTH 128, LLC; CARDINAL HEALTH 132, LLC; CARDINAL HEALTH 200, LLC; CARDINAL HEALTH PHARMACY SERVICES, LLC; and PHARMEDIUM SERVICES, LLC (the "Distributor Defendants") shipped prescription opioids throughout the country, including Maryland. Rather than meet their obligations under Maryland law to report suspicious orders of controlled substances, the Distributor Defendants willfully ignored impossibly large orders being shipped to locations where it was inconceivable that any legitimate medical need could have required the quantities shipped. They failed to report these suspicious shipments despite their clear statutory and common law obligations to do so, and in contravention of their own internal policies and procedures. The Distributor Defendants' breaches of their respective reporting obligations were willful, motivated by their desire to maximize profits, and were committed without consideration of the cost to the Municipal Plaintiffs or its citizenry.

**C. The Pharmacy Defendants Understood But Violated Their Duties**

7. Defendants MARYLAND CVS PHARMACY, L.L.C., RITE AID OF MARYLAND, INC., DIMENSIONS HEALTH CORPORATION dba UNIVERSITY OF MARYLAND PRINCE GEORGE'S HOSPITAL CENTER, MEDSTAR SOUTHERN MARYLAND HOSPITAL CENTER, INC., GIANT FOOD STORES, LLC., KAISER FOUNDATION HEALTH PLAN OF THE MID-ATLANTIC STATES, INC., DOCTOR'S HOSPITAL, INC., PHARMACY CORP. OF AMERICA dba PHARMERICA, SAFEWAY, INC., and ACCOKEEK DRUG AND HEALTH CARE, INC. (collectively, the "Pharmacy Defendants") earned enormous profits by flooding the State of Maryland, including the Towns, with prescription opioids. They gained unique knowledge of the oversupply of prescription opioids through the extensive data and information they developed and maintained in connection with dispensing opioids to the Towns' patients. Rather than act to stem the flow of opioids into communities like the Towns, they participated in and profited from the oversupply. The Pharmacy Defendants own and operate several pharmacies located in and around the Towns, which, on information and belief, are top dispensers of opioids to the Towns' residents who were Defendants' patients.

**D. The Devastating Effects of Defendants' Conduct**

8. Each of the Defendants was fully aware that its products placed patients at an unreasonable risk of opioid-related addiction and/or death. Despite this knowledge, the Manufacturer Defendants continue to misrepresent the risks associated with prescription opioids and their efforts to influence physicians with the goal of increasing sales of prescription opioids to the Towns' citizens. Likewise, the Distributor Defendants continue to breach their duties under Maryland law to monitor, report, and prevent suspicious shipments of prescription opioids.

**Figure 1: U.S. Opioid Death Rates Per 100,000 People, 2000-2016**




* Statistically significant at 95% level.
Source: SHADAC analysis of vital statistics data from the CDC WONDER system.

9. This conduct precipitated the opioid crisis that has ravaged and blighted the Municipal Plaintiffs' and surrounding communities since the early 2000s, and will continue to do so for many years, even decades, to come. Defendants' scheme has succeeded—Defendants have made untold billions of dollars from prescription opioids. Meanwhile, the death toll they have caused in the Towns and elsewhere is unconscionable.

10. Each of the Towns provides a broad array of services necessitated by and related to the opioid epidemic, including various public safety and drug education programs. In addition, the opioid crisis has increased the demands on the Towns' law enforcement and public service programs for adults, families, and children. Given the social impacts caused by the opioid crisis, the Towns have had to funnel resources from other important social and public services to combat the scourge of the opioid epidemic. This creates a perverse dichotomy. The overburdened service areas require a *greater share* of the Towns' finite funds, while at the same time, the crisis itself *decreases* revenue the Towns can generate. That is because opioid addiction takes productive members of society out of the economy, usually due to death or the inability to work. Simply put, most who become addicted to opioids are no longer able to work, and therefore are no longer able to care for their families, earn a paycheck or spend money in the same way they did before they

fell victim to addiction. In addition, opioid addicts often neglect their real or leasehold properties which results in an increased need for code and/or ordinance enforcement and nuisance abatement efforts and costs. These harms are the direct and proximate result of Defendants' scheme to increase their profits without regard for the end users of Defendants' drugs, or the municipalities that must bear the brunt of the increased demand for their services brought on by the epidemic.

11. Things were not always this way in the Towns. Though Defendants have been manufacturing, marketing, distributing, selling, and/or prescribing prescription opioids for decades—including brand-name drugs like OxyContin, Percocet, and Duragesic, as well as generic formulations of these drugs such as oxycodone, hydrocodone, and fentanyl—only since the late 1990s have Defendants' powerful narcotic painkillers been used to treat more than just short-term, acute or cancer-related pain. Indeed, for the vast majority of the twentieth century, Defendants' drugs were considered too addictive and debilitating for patients suffering from long-term (chronic) pain due to non-cancer conditions like arthritis, fibromyalgia and migraines.[2]

12. In the late 1990s, however, and continuing today, Defendants began a sophisticated marketing and distribution scheme premised on deception to persuade patients that opioids can and should be used to treat chronic pain. Defendants spent, and some continue to spend, millions of dollars on promotional activities and materials that falsely deny or trivialize the risks of opioids and overstate the benefits of opioids. As to the risks, Defendants falsely and misleadingly: (1) downplayed the serious risk of addiction;[3] (2) promoted the concept of "pseudoaddiction," falsely

---

[2] In this Complaint, "chronic pain" refers to non-cancer pain lasting three months or longer.

[3] Addiction is classified as a spectrum of "substance use disorders" that range from misuse and abuse of drugs to addiction. Patients suffer negative consequences wherever they fall on this spectrum. In this Complaint, "addiction" refers to the entire range of substance abuse disorders. (*See, e.g.*, American Society of Addiction Medicine ("ASAM"), Public Policy Statements, *Terminology Related to the Spectrum of Unhealthy Substance Use*, p. 1-2 (July 2013),

claiming that signs of addiction should be treated with more opioids; (3) exaggerated the effectiveness of screening tools in preventing addiction; (4) claimed that opioid dependence and withdrawal are easily managed; (5) denied the risks of higher opioid dosages; and (6) exaggerated the effectiveness of abuse-deterrent opioid formulations to prevent abuse by—*inter alia*—falsely claiming these opioids "cannot be crushed." Defendants also falsely touted the benefits of long-term opioid use, including its supposed ability to improve function and quality of life, even though there was no credible evidence to support those benefits—a fact that Defendants not only knew at all times relevant to this action, but effectively suppressed and concealed.

13. Indeed, at all times relevant to this action, Defendants knew their longstanding and ongoing misrepresentations of the risks and benefits of opioids were not supported by or were directly contrary to the scientific evidence. Moreover, regulators and the medical community at large have come to recognize the serious risks posed by opioid pain medications. Indeed, according to recently established and widely accepted clinical guidelines for opioid therapy, "[t]he science of opioids for chronic pain is clear: for the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits."[4]

14. Opioid manufacturers, including Defendant Endo Pharmaceuticals, Inc., have also entered into agreements with public entities that prohibit them from making many of the misrepresentations identified in this Complaint in other jurisdictions. Yet even now, Defendants continue to misrepresent the risks and benefits of long-term opioid use in Maryland, including in the Towns, and continue to fail to correct their past misrepresentations.

---

https://www.asam.org/docs/default-source/public-policy-statements/1-terminology-spectrum-sud-7-13.pdf?sfvrsn=d93c69c2_2.

[4] Thomas R. Frieden et al., *Reducing the Risks of Relief— The Opioid-Prescribing Guideline*, 374 New Eng. J. Med. 1501-1504 (2016).

15. Specifically, Defendants concealed what their own internal documents and communications show they already knew, and had known for decades: not only were Defendants' opioids both medically unnecessary and, in fact, life-threatening for non-cancer patients with chronic pain, but further, none of Defendants' representations about the manageability or prevention of opioid addiction were true. As set forth in detail below, for decades, the Manufacturer and Distributor Defendants have made and continue to make a series of inaccurate claims about the risks and benefits associated with their opioids, essentially bribing Key Opinion Leader ("KOL") groups to substantiate the veracity of Defendants' false statements. In creating the illusion that prescription opioids were a low risk treatment option for chronic pain relative to non-opioid pharmacologic approaches, Defendants successfully targeted vulnerable patient populations like the elderly. Defendants further tainted the sources that many doctors and patients in the Towns relied upon for guidance, including treatment guidelines, continuing medical education programs, medical conferences and seminars, and scientific articles. As a result, Defendants successfully transformed the way doctors treat chronic pain in the Towns, opening the floodgates of opioid prescribing and use. This explosion in opioid prescriptions and use has padded Defendants' profit margins at the expense of chronic pain patients.

16. The explosion in opioid prescriptions and use caused by Defendants has led to a public health crisis in Maryland, including in the Towns. Maryland faces skyrocketing opioid addiction and opioid-related overdoses and deaths as well as devastating social and economic consequences. This public health crisis is a public nuisance because it significantly interferes with the public health, the public safety, the public peace, the public comfort, and the public convenience. The effects of Defendants' deceptive marketing scheme are catastrophic and are only getting worse. These effects are devastating in Maryland. Between 2015 and 2016 alone,

the number of opioid-related deaths spiked 70% and continued to increase by 8% between 2016 and 2017.[5] In 2017, 88% of all intoxication deaths that occurred in Maryland were opioid-related.[6] Specifically, in 2017, there were approximately 1,985 opioid-related overdose deaths in Maryland at a rate of 32.2 deaths per 100,000 people, which is twofold greater than the national rate of 14.6 deaths per 100,000 people, placing Maryland in the top five for opioid-related deaths in the United States.[7] As regulators observed in 2016, "[t]hings are getting worse, not better, with the epidemic of opioid misuse, abuse and dependence."

17. There is little doubt that Defendants' deceptive marketing and distribution scheme has precipitated this public health crisis in Maryland, including in the Towns, by dramatically increasing opioid prescriptions and use. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids (the supply), while the widespread use of opioids has created a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

18. Defendants' deceptive marketing and distribution scheme have had further foreseeable impacts on the Towns. As a result of Defendants' conduct, the Towns must devote increased resources to the burden of the addicted homeless who commit drug and property crimes, to feed their addiction. For example, tax dollars are required to maintain public safety of places where the addicted homeless attempt to congregate, including parks, schools and public lands. Tax

---

[5] Maryland Department of Health and Mental Hygiene, *Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2017*, at 5, *available at* https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Documents/Drug_Intox_Report_2017.pdf.

[6] *Id.*

[7] *Maryland Opioid Summary*, https://www.drugabuse.gov/opioid-summaries-by-state/maryland-opioid-summary.

dollars are required to fight the infectious disease brought by the addicted and particularly the addicted homeless. Hepatitis B and C, HIV, sexually transmitted disease and methicillin-resistant Staphylococcus aureus ("MRSA") have been demonstrated to be spread by opioid abuse.

19. Defendants' willful and wrongful conduct has further impacted the Towns by creating a public nuisance in each town, which Defendants foresaw or should have foreseen, yet deliberately ignored. Defendants were aware, at all relevant times when they deceptively marketed their products as non-addictive, that such addiction would be highly difficult to overcome.

20. The role of Defendants' deceptive marketing and distribution scheme in causing this public health crisis has become well-recognized in recent years. In her May 2014 testimony to the Senate Caucus on International Narcotics Control on behalf of regulators, Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."[8] In the years since her comments were initially published, Dr. Volkow's message has become the dominant view of the top experts and influencers in the medical community, who are finally realizing just how addictive Defendants' opioids are, and how devastating the economic and social costs of Defendants intentional deception have been.[9]

21. Absent the Manufacturer Defendants' deceptive marketing scheme and the Distributor and Pharmacy Defendants' improper distribution, the opioid use, misuse, abuse, and

---

[8] N. Volkow, M.D., *America's Addiction to Opioids: Heroin and Prescription Drug Abuse*, National Institute on Drug Abuse, (May 14, 2014), available at: https://www.drugabuse.gov/about-nida/legislative-activities/testimony-tocongress/2016/americas-addiction-to-opioids-heroin-prescription-drug-abuse.

[9] E. O'Brien, *Here's What it Would Cost to Fix the Opioid Crisis, According to 5 Experts*, Time Money (Nov. 27, 2017), http://time.com/money/5032445/cost-fix-opioid-crisis/

addiction in the Towns would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

22. By falsely downplaying the risks and grossly exaggerating the benefits of long-term opioid use through their deceptive marketing claims, despite their knowledge of the falsity of those claims, and by improperly distributing prescription opioids as set forth herein, Defendants have not only engaged in false advertising and unfair competition, but they have also created or assisted in the creation of a public nuisance.

23. Accordingly, Defendants' conduct, both individually and collectively, has violated and continues to violate Maryland's public nuisance laws. The Municipal Plaintiffs do not ask this Court to weigh the risks and benefits of long-term opioid use. Instead, the Municipal Plaintiffs seek an order requiring Defendants to cease their unlawful promotion and distribution of opioids, to correct their misrepresentations, and to abate the public nuisance they have created. To redress and punish Defendants' previous and current violations of law that cause and continue to cause harm to the Towns and its citizens, the Municipal Plaintiffs seek a judgment requiring Defendants to pay civil penalties, and any fees or costs permitted under law, in an amount to be determined at trial.

24. By this action, the Municipal Plaintiffs further seek to recoup tax dollars spent for the consequences of Defendants' wrongful conduct in causing the opioid epidemic and its impact on the Towns, and to abate the opioid nuisance so the Towns will not be required to spend further taxpayer dollars on the epidemic wrought by Defendants.

## II. PARTIES

### A. Plaintiffs

25. The Towns of Cottage City, Forest Heights, North Brentwood, and Upper Marlboro, by and through their attorneys hereto, hereby bring this action on behalf of the residents, visitors and taxpayers of the Towns to protect the public from false and misleading advertising, unlawful, unfair, and fraudulent business practices, and a public nuisance.

26. The Town of Cottage City is a municipal corporation in Maryland in Prince George's County ("County") and is home to approximately 1,366 residents.

27. The Town of Forest Heights is a municipal corporation in Maryland in Prince George's County and is home to approximately 2,572 residents.

28. The Town of North Brentwood is a municipal corporation in Maryland in Prince George's County and is home to approximately 566 residents.

29. The Town of Upper Marlboro is a municipal corporation in Maryland, the seat of Prince George's County government, and is home to approximately 673 residents.

### B. Manufacturer Defendants

#### 1. Actavis/Allergan

30. Defendant Allergan PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. Actavis PLC acquired Allergan PLC in March 2015, and the combined company changed its name to Allergan PLC in June 2015. Before that, Watson Pharmaceuticals, Inc. acquired Actavis, Inc. in October 2012, and the combined company changed its name to Actavis, Inc. as of January 2013 and then Actavis PLC in October 2013. Defendant Actavis LLC is a limited liability company, formed in Delaware, headquartered in New Jersey, and on information and belief, has members who are citizens of New Jersey and

Pennsylvania. Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal place of business in Corona, California, and is a wholly-owned subsidiary of Allergan PLC (f/k/a Actavis, Inc., f/k/a Watson Pharmaceuticals, Inc.). Defendant Actavis Pharma, Inc. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as Watson Pharma, Inc. Defendant Actavis PLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Each of these Defendants is owned by Allergan PLC, which uses them to market and sell its drugs in the United States, including in Maryland and the Towns specifically. Upon information and belief, Allergan PLC exercises control over these marketing and sales efforts and profits from the sale of Allergan/Actavis products ultimately inure to its benefit. (Allergan PLC, Actavis PLC, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to in this Complaint as "Actavis.")

31. Actavis manufactures, promotes, sells, and distributes opioids, including the branded drugs Kadian and Norco, a generic version of Kadian, and generic versions of Duragesic and Opana, in the U.S., Maryland, and the Towns specifically. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009.

**2. Cephalon**

32. Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In 2011, Teva Ltd. acquired Cephalon, Inc. Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation and is a wholly owned subsidiary of Teva Ltd. in Pennsylvania.

33. Cephalon manufactures, promotes, sells, and distributes opioids such as Actiq and Fentora in the United States, including in Maryland and the Towns specifically. Both Actiq and Fentora are over 100 times more powerful than morphine. Thus, Actiq has been approved only for the "management of breakthrough cancer pain in patients 16 years and older with malignancies who are already receiving and who are tolerant to around-the-clock opioid therapy for the underlying persistent cancer pain." Similarly, Fentora is legal and approved only for the "management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to around-the-clock opioid therapy for their underlying persistent cancer pain." Neither Actiq nor Fentora are appropriate treatments for chronic pain.

**3. Teva**

34. Teva Ltd., Teva USA, and Cephalon work together closely to market and sell Cephalon products in the United States, including in Maryland and the Towns specifically. Teva Ltd. conducts all sales and marketing activities for Cephalon in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon branded products through its "specialty medicines" division. Prescribing information and medication guide, which were approved by regulators and distributed with Cephalon opioids, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

35. All of Cephalon's promotional websites, including those for Actiq and Fentora, display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full

year of Cephalon's specialty sales," including *inter alia* sales of Fentora. Through interrelated operations like these, Teva Ltd. operates in the United States through its subsidiaries Cephalon and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. Teva has engaged in consensual commercial dealings in Maryland, and has purposefully availed itself of the advantages of conducting business with and within Maryland. Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., and Cephalon, Inc. are referred to as "Cephalon" for the remainder of this Complaint.

36. Notably, on May 26, 2019, Teva Pharmaceuticals agreed to settle a lawsuit brought by the Oklahoma Attorney General on behalf of the State of Oklahoma for $85 million dollars which accuses Teva (and other manufacturers) of creating a public nuisance through its production and marketing of prescription opioids.[10] The Municipal Plaintiffs allege similar claims against Teva and its subsidiaries in this Complaint.

**4. Endo**

37. Defendant Endo Health Solutions Inc. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. Defendant Endo Pharmaceuticals, Inc. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to as "Endo").

---

[10] Oklahoma Attorney General, Press Release—*Attorney General Hunter Announces Settlement with Teva Pharmaceuticals*, (May 26, 2019), http://www.oag.ok.gov/attorney-general-hunter-announces-settlement-with-teva-pharmaceuticals.

38. Endo develops, markets, and sells prescription drugs, including the brand name opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the U.S. and Maryland. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and it accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Maryland, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc.

**5. Janssen**

39. Defendant Janssen Pharmaceuticals, Inc. (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc. and Janssen Pharmaceuticals, Inc.) is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of Defendant Johnson & Johnson ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. These entities, which are collectively referred to herein as "Janssen," acted in concert with one another—as agents and/or principals of one another—in connection with the conduct described herein. J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with regulators regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceuticals' drugs and Janssen's profits inure to J&J's benefit. The Janssen and J&J parties are collectively referred to as "Janssen."

40. Janssen manufactures, promotes, sells, and distributes drugs in the U.S. and Maryland, and the Towns specifically, including the opioid Duragesic. Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed,

and sold the opioids Nucynta and Nucynta ER, which also generated substantial sales revenue for the company, accounting for $172 million in sales in 2014 alone.

### 6. Johnson & Johnson

41. Defendant Johnson & Johnson ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey, imposes a code of conduct on Janssen as a pharmaceutical subsidiary of J&J. The "Every Day Health Care Compliance Code of Conduct" posted on Janssen's website is a J&J company-wide document that describes Janssen as one of the "pharmaceutical Companies of Johnson and Johnson" and as one of the "Johnson & Johnson Pharmaceutical Affiliates." It governs how "[a]ll employees of Johnson & Johnson Pharmaceutical Affiliates," including those of Janssen, "market, sell, promote, research, develop, inform and advertise Johnson & Johnson Pharmaceutical Affiliates' products." All Janssen officers, directors, employees, and sales associates must certify that they have "read, understood and will abide by" the code of conduct. Thus, the code of conduct governs all forms of marketing at issue in this case.

42. In addition, J&J made payments to front groups, discussed herein, who perpetuated and disseminated Defendants' misleading marketing messages regarding the risks and benefits of opioids.[11]

### 7. Mallinckrodt/SpecGX

43. Defendant Mallinckrodt PLC is an Irish public limited company headquartered in Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri.

---

[11] U.S. Senate Homeland Security & Governmental Affairs Committee, Ranking Member's Office, Staff Report, *Fueling an Epidemic, Report Two, Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Groups*, n. 23 ("Payments from Janssen include payments from Johnson & Johnson Health Care Systems, Inc.").

Mallinckrodt PLC was incorporated in January 2013 for the purpose of holding the pharmaceuticals business of Covidien PLC, which was fully transferred to Mallinckrodt in June of that year. Mallinckrodt began as a U.S.-based company, with the founding of Mallinckrodt & Co. in 1867. Tyco International Ltd. acquired the company in 2000. In 2008, Tyco Healthcare Group separated from Tyco International Ltd. and renamed itself Covidien.

44. Defendant Mallinckrodt, LLC is a limited liability company formed in Delaware and headquartered with its principal place of business in St. Louis, Missouri. On information and belief, at least one of Mallinckrodt LLC's members is a citizen of Missouri.

45. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, PLC.

46. Defendant SpecGX LLC ("SpecGX") is a limited liability company formed in Delaware and headquartered with its principal place of business in St. Louis, Missouri. On information and belief, at least one of SpecGX's members is a citizen of Missouri. SpecGX is a wholly owned subsidiary of Mallinckrodt PLC and is registered to do business in Maryland.

47. Together, Mallinckrodt PLC, Mallinckrodt, LLC, and SpecGX LLC (collectively, "Mallinckrodt") manufacture, market, and sell drugs in the United States, including Maryland and the Towns specifically. As of 2012, it was the largest U.S. supplier of opioid pain medications. In particular, it is one of the largest manufacturers of oxycodone in the U.S. and Maryland.

48. Mallinckrodt currently manufactures and markets two branded opioids: Exalgo, which is extended-release hydromorphone, sold in 8, 12, 16, and 32 mg dosage strengths, and Roxicodone, which is oxycodone, sold in 15 and 30 mg dosage strengths. In addition, Mallinckrodt previously developed, promoted, and sold the following branded opioid products: Magnacet, TussiCaps, and Xartemis XR.

49. While it has sought to develop its branded opioid products, Mallinckrodt has long been a leading manufacturer of generic opioids. Mallinckrodt estimated that, in 2015, it received approximately 25% of one regulator's entire annual quota for controlled substances that it manufactures. Mallinckrodt also estimated, based on health data for the same period, that its generics claimed an approximately 23% market share of opioid and oral solid dose medications.

50. Mallinckrodt operates a vertically integrated business in the United States: (1) importing raw opioid materials; (2) manufacturing generic opioid products, primarily at its facility in Hobart, New York; and (3) marketing and selling its products to drug distributors, specialty pharmaceutical distributors, retail pharmacy chains, pharmaceutical benefit managers that have mail-order pharmacies, and hospital buying groups throughout the United States, including in Maryland and the Towns specifically.

**8. Mylan**

51. Defendant Mylan Institutional Inc. ("Mylan Institutional") is an Illinois corporation headquartered in Rockford, Illinois. Mylan Institutional manufactures and markets pharmaceutical products. Defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharmaceuticals") is based in Morgantown, West Virginia, and is also a major manufacturer and marketer of opioids in and around the Towns. Both Mylan Institutional and Mylan Pharmaceuticals (collectively, "Mylan") are subsidiaries of Defendant Mylan Pharmaceuticals NV, which is the second-largest generic and specialty pharmaceuticals company in the world, registered in the Netherlands with principal executive offices in Hatfield, Hertfordshire, UK and a global center in Canonsburg, Pennsylvania. At all times relevant, Mylan manufactured and marketed prescription opioids throughout the United States, including in Maryland and the Towns specifically. On information and belief,

Mylan is a top manufacturer of fentanyl, oxycodone, morphine, and codeine in and around the Towns.

**9. Hospira, Inc.**

52. Defendant Hospira, Inc. ("Hospira"), a Delaware corporation, with its principal place of business in Lake Forest, Illinois and is the former hospital-products division of Abbott Laboratories. Hospira was the world's largest producer of generic injectable pharmaceuticals before being acquired by Pfizer in September 2015.

53. At all times relevant to this action, Hospira manufactured and marketed opioids across the county and in Maryland and in and around the Towns specifically. On information and belief, Hospira is a top manufacturer of fentanyl, morphine, hydromorphone, meperidine and buprenorphine in and around the Towns.

**10. Sandoz**

54. A subsidiary of Novartis International AG, Defendant Novartis Pharmaceuticals Corporation f/k/a Sandoz, Inc. ("Sandoz") is headquartered in Princeton, New Jersey and develops, manufactures, markets and distributes generic pharmaceutical products, including fentanyl. At all times relevant, Sandoz manufactured and marketed prescription opioids throughout the United States, including in Maryland and in and around the Towns specifically. On information and belief, Sandoz is a top manufacturer of fentanyl in the area.

**11. West-Ward Pharmaceuticals Corp.**

55. Defendant Hikma Pharmaceuticals USA, Inc. f/k/a West-Ward Pharmaceuticals Corp. is headquartered in Eatontown, New Jersey and manufactures, markets and/or distributes opioids such as fentanyl and morphine. West-Ward Pharmaceuticals Corp. ("West-Ward") is a wholly owned subsidiary of Hikma Pharmaceuticals plc, and represented 51% of Hikma's group

sales in 2014. Since acquiring Baxter Healthcare Corporation's Multi-Source Injectables division in 2011, West-Ward has become the second largest injectable supplier by volume in the country. At all times relevant, West-Ward manufactured and marketed prescription opioids throughout the United States, including in Maryland and in and around the Towns specifically.

**12. PharMEDium Services, LLC**

56. Defendant PharMEDium Services LLC ("PharMEDium"), a subsidiary of AmerisourceBergen, is headquartered in Lake Forest, Illinois, and manufactures, markets and/or distributes opioids such as fentanyl and morphine. At all times relevant, PharMEDium manufactured and marketed prescription opioids throughout the United States, including in Maryland and in and around the Towns specifically.

**13. Indivior, Inc.**

57. Defendant Indivior, Inc. ("Indivior") is headquartered in Richmond, Virginia, and manufactures, markets and/or distributes opioids such as fentanyl and morphine. The company was formed as a division of Reckitt Benckiser, when Reckitt Benckiser created its specialty pharmaceuticals business as a separate entity named Invidior. At all times relevant, Indivior manufactured and marketed prescription opioids throughout the United States, including in Maryland and in and around the Towns specifically.

58. Notably, in 2019, Indivior was indicted over claims that it had made false marketing claims regarding its drug, Suboxone. Invidior was indicated and accused of deceiving doctors and healthcare benefit programs into believing Suboxone, a form of opioid, was safer and less susceptible to abuse than similar drugs. As part of the settlement of the claim, the company agreed to pay up to $1.4 billion for the alleged misconduct.

### 14. The Insys Individual Defendants: John Kapoor and Michael Babich

59. Insys Therapeutics, Inc. ("Insys") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys manufactures, markets, sells and distributes nationwide several types of opioids, including Subsys—a fentanyl sublingual spray and semi-synthetic opioid antagonist—as well as Syndros, a cannabinoid medicine used in adults to treat common side-effects of opioid use, particularly for patients whose nausea and vomiting have not improved with usual anti-nausea and vomiting medicines. Subsys and Syndros were approved for widespread use in 2012 and 2016, respectively.

60. Subsys is indicated "for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and are tolerant to opioid therapy for their underlying persistent cancer pain."[12] The indication also specifies that "Subsys is intended to be used only in the care of cancer patients and only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." In addition, the indication provides that "[p]atients must remain on around-the-clock opioids when taking SUBSYS." Subsys is contraindicated for, among other ailments, the "[m]anagement of acute or postoperative pain including headache/migraine and dental pain." It is available in 100 mcg, 200 mcg, 400 mcg, 600 mcg and 800 mcg dosage strengths.

61. Insys's revenue is derived almost entirely from Subsys. According to its Form 10-K for 2015, Insys reported revenues of $331 million. Of that total, $329.5 million was derived from sales of Subsys. The majority of Insys's sales of Subsys are through wholesalers, including

[12] The indication provides that "[p]atients considered opioid tolerant are those who are taking around-the-clock medicine consisting of at least 60 mg of oral morphine daily, at least 25 mcg of transdermal fentanyl/hour, at least 30 mg of oral oxycodone daily, at least 8 mg of oral hydromorphone daily or an equianalgesic dose of another opioid daily for a week or longer."

Defendants AmerisourceBergen and Cardinal Health. In 2015, those wholesalers respectively comprised 20% and 14% of Insys's total gross sales of Subsys.

62. On June 7, 2019, the pharmaceutical arm of Insys formally pled guilty to federal charges connected to allegations that the company bribed doctors to prescribe a powerful opioid to patients who did not need it, as part of a $225 million dollar deal entered into with the federal government in the United States District Court for the District of Massachusetts.[13]

63. Defendant John Kapoor is the founder and majority owner of Insys. In October of 2017, Kapoor was arrested and charged with various violations of fraud and abuse laws as well as conspiracy for his alleged participation in a nationwide scheme to bribe healthcare providers in various states, including Maryland, to prescribe Subsys.[14] On May 2, 2019, he was found guilty of these charges in connection with running a nation-wide bribery scheme.[15] He is a resident of Phoenix, Arizona, and a current member of the Board of Directors of Insys.

64. Defendant Michael Babich is the former CEO and President of Insys. In 2017, he was also arrested on charges of various violations of fraud and abuse laws as well as conspiracy, in connection with running a nationwide bribery scheme to increase sales of Subsys. In January 2019, Defendant Babich pleaded guilty to these charges.[16] He is a citizen of Scottsdale, Arizona.

---

[13] https://www.law360.com/articles/1166925/insys-pleads-guilty-to-fraud-in-opioid-bribe-scheme.

[14] *Press Release—Founder and Owner of Pharmaceutical Company Insys Arrested and Charged* (Oct. 26, 2017), https://www.justice.gov/usao-ma/pr/founder-and-owner-pharmaceutical-company-insys-arrested-and-charged-racketeering.

[15] Emanuel, Gabrielle, *Opioid Executive John Kapoor Found Guilty in Landmark Bribery Case* (May 2, 2019) https://www.npr.org/2019/05/02/711346081/opioid-executive-john-kapoor-found-guilty-in-landmark-bribery-case.

[16] Jonathan Saltzman, *Former CEO says Insys founder pushed for higher doses of opioid*, BOSTON GLOBE (Feb. 12, 2019), https://www2.bostonglobe.com/business/2019/02/12/former-ceo-says-insys-founder-pushed-for-higher-doses-opioid/aZhLcDEnayOO3dzPlFn9gN/story.html.

### C. Distributor Defendants

#### 15. AmerisourceBergen

65. Defendant Distributor AmerisourceBergen Drug Corporation is a publicly traded company headquartered in Pennsylvania and incorporated under the laws of Delaware. Defendant Distributor AmerisourceBergen Corporation is the parent company of AmerisourceBergen Drug Corporation and registered to do business in Maryland. (Amerisource Bergen Drug Corporation and AmerisourceBergen Corporation shall collectively be referred to as "AmerisourceBergen"). AmerisourceBergen is in the chain of distribution of prescription opioids. At all relevant times, AmerisourceBergen was in the business of distributing substantial amounts of prescription opioids to providers and retailers. AmerisourceBergen has engaged in consensual commercial dealings in the Towns, and has purposefully availed itself of the advantages of conducting business with and within the Towns.

#### 16. Cardinal Health

66. Defendant Distributor Cardinal Health, Inc., is an Ohio pharmacy wholesaler and drug distribution corporation with its headquarters located in Dublin, Ohio. Defendant Distributor Cardinal Health 121, LLC is a limited liability company formed in Delaware with its principal place of business located in Columbia, Maryland. On information and belief, at least one of Cardinal Health 121, LLC's members is a citizen of Ohio. Defendant Distributor Cardinal Health 122, LLC is a limited liability company formed in Delaware with its principal place of business located in Ellicott City, Maryland. Defendant Distributor Cardinal Health 100, Inc. is an Indiana corporation with its principal place of business located in Dublin, Ohio. Defendant Distributor Cardinal Health 108, LLC is a limited liability company formed in Delaware with its principal place of business in LaVergne, Tennessee. On information and belief, at least one of Cardinal

Health 108, LLC's members is a citizen of Ohio. Defendant Distributor Cardinal Health 107, LLC is a limited liability company formed in Ohio with its principal place of business in Dublin, Ohio. On information and belief, at least one of Cardinal Health 107, LLC's members is a citizen of Ohio. Defendant Distributors Cardinal Health 110, LLC; Cardinal Health 128, LLC; Cardinal Health 200, LLC; and Cardinal Health 5, LLC are limited liability companies formed in Delaware with their principal place of business in Dublin, Ohio. On information and belief, at least one of Cardinal Health 110, LLC's; Cardinal Health 128, LLC's; Cardinal Health 200, LLC's; and Cardinal Health 5, LLC's members is a citizen of Ohio. Defendant Distributors Cardinal Health 132, LLC and Cardinal Health Pharmacy Services, LLC are limited liability companies formed in Delaware with their principal place of business in Houston, Texas. On information and belief, at least one of Cardinal Health 132, LLC's and Cardinal Health Pharmacy Services, LLC's members is a citizen of Ohio. (Cardinal Health, Inc.; Cardinal Health 121, LLC; Cardinal Health 122, LLC; Cardinal Health 100, Inc.; Cardinal Health 108, LLC; Cardinal Health 107, LLC; Cardinal Health 128, LLC; Cardinal Health 5, LLC; Cardinal Health 110, LLC; Cardinal Health 200, LLC; Cardinal Health Pharmacy Services, LLC; and Cardinal Health 132, LLC are all registered to do business in Maryland and shall collectively be referred to as "Cardinal Health.") At all relevant times, Cardinal Health was in the business of distributing substantial amounts of prescription opioids to providers and retailers. Cardinal Health has engaged in consensual commercial dealings in the Towns, and has purposefully availed itself of the advantages of conducting business with and within the Towns. Cardinal Health is in the chain of distribution of prescription opioids.

67. Defendants AmerisourceBergen and Cardinal Health are collectively referred to as the "Distributor Defendants." Manufacturers of opioids have transferred prescription opioids to the Distributor Defendants for years. The Distributor Defendants dominate 85 to 90 percent of all

revenues from drug distribution in the United States, estimated to be at $378.4 billion in 2015. The Distributor Defendants supplied opioids to hospitals, pharmacies, doctors and other healthcare providers, which then dispensed the drugs to patients in Maryland, including in the Towns. The Distributor Defendants have had substantial contacts and business relationships with the citizens of the Towns. The Distributor Defendants have purposefully availed themselves of business opportunities within the Towns.

**D. Pharmacy Defendants**

68. Pharmacy Defendants Rite Aid of Maryland, Inc. ("Rite Aid"), Maryland CVS Pharmacy, L.L.C. ("CVS"), Dimensions Health Corporation dba University of Maryland Prince George's Hospital Center ("Prince George's Hospital"), Medstar Southern Maryland Hospital Center, Inc. ("Southern Maryland Hospital"), Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., ("Kaiser"), Doctor's Hospital, Inc. ("Doctor's Hospital"), Pharmacy Corp. of America dba Pharmerica, Accokeek Drug and Health Care, Inc. ("Accokeek Drug"), Giant Food Stores, LLC ("Giant Food"), and Safeway Inc. ("Safeway"), earned enormous profits by flooding the State of Maryland, including the Towns, with prescription opioids. They gained unique knowledge of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Rather than act to stem the flow of opioids into communities like the Towns, they participated in and profited from the oversupply. Further, on information and belief, each of the Pharmacy Defendants has committed and continues to commit serious and flagrant violations of their duties under Maryland law regarding—*inter alia*—recordkeeping and dispensing opioids to the Towns' patients. (*See, e.g.*, COMAR 10.19.03.03, 10.19.03.12.)

**1. Rite Aid of Maryland, Inc.**

69. Defendant Rite Aid of Maryland, Inc. ("Rite Aid") is a domestic Maryland corporation with its principal place of business located at 2405 York Road, Suite 101 in Lutherville Timonium, MD 21093-2264. Defendant Rite Aid owns and operates (or formerly owned and operated during the relevant time periods) several pharmacies in and around the Towns, including, but not limited to, Rite Aid Store #03799, located at 4705 Silver Hill Road, Suitland, MD, 20746; Rite Aid Store #03813, located at 9530 Crain Highway, Upper Marlboro, MD, 20772; Rite Aid Store #04983, located at 6130 Baltimore Avenue, Riverdale, MD, 20737; Rite Aid Store #07766, located at 12701 Laurel Bowie Rd., Laurel, MD, 20708; Rite Aid Store #07840, located at 9810 Apollo Drive, Largo, MD, 20774; Rite Aid Store #11201, located at 5741 Silver Hill Road, District Heights, MD, 20747; Rite Aid Store #03803, located at 10456 Baltimore Avenue., Beltsville, MD, 20705; and Rite Aid Store #02585, located at 9139 Riggs Road., Adelphi, MD, 20783. On information and belief, Defendant Rite Aid and its pharmacies are top dispensers of opioids in and around the Towns and have committed and continues to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**2. Maryland CVS Pharmacy, L.L.C.**

70. Defendant CVS is an active Maryland limited liability company with its principal place of business located at 2405 York Road, Suite 201 in Lutherville Timonium, MD 21093-

2264. Defendant CVS owns and operates several pharmacies in and around the Towns, including, but not limited to, CVS Store #1495, located at 11729 Beltsville Drive, Beltsville, MD, 20705; CVS Store #2778, located at 11100 Baltimore Avenue, Beltsville, MD, 20705; CVS Store #1451, located at 6920 Laurel-Bowie Road, Bowie, MD, 20715; CVS Store #1454, located at 1910 Crain Hwy, Bowie, MD, 20716; CVS Store #5875, located at 6001 High Bridge Road, Bowie, MD, 20720; CVS Store #1496, located at 7050 Allentown Road, Camp Springs, MD, 20748; CVS Store #1491, located at 8859 Branch Avenue, Clinton, MD 20735; CVS Store #1514, located at 3611 Bladensburg Road, Colmar Manor, MD, 20722; CVS Store #1476, located at 7012 Marlboro Pike, Forestville, MD, 20747; CVS Store #1436, located at 3130 Queens Chapel Road, Hyattsville, MD, 20782; CVS Store #1486, located at 5621 Sargent Road, Chillum, MD, 20782; CVS Store #1448, located at 8201 Annapolis Road, New Carrollton, MD, 20784; CVS Store #1456, located at 10692 Campus Way South, Upper Marlboro, MD, 20774; CVS Store #1470, located at 7600 SE Crain Hwy, Upper Marlboro, MD, 20772; CVS Store #1505, located at 28 Watkins Drive, Upper Marlboro, MD, 20774; and CVS Store #1795, located at 5100 Brown Station Road, Upper Marlboro, MD, 20772. On information and belief, Defendant CVS and its pharmacies are top dispensers of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**3. Prince George's Hospital**

71. Defendant Prince George's Hospital is a local hospital facility that provides inpatient and outpatient services located at 3001 Hospital Drive, Cheverly, MD, 20785. On information and belief, Defendant Prince George's Hospital is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**4. Southern Maryland Hospital**

72. Defendant Southern Maryland Hospital is a local hospital facility that provides inpatient and outpatient services located at 7503 Surratts Road, Clinton, MD, 20735. On information and belief, Defendant Southern Maryland Hospital is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**5. Kaiser**

73. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. ("Kaiser") is a Maryland non-stock corporation with its principal Maryland office located at 2101 East Jefferson Street, Rockville, Maryland, 20852. Upon information and belief, Defendant Kaiser operates a local hospital facility that provides inpatient and outpatient services located at 6525 Belcrest Road, Hyattsville, MD, 20782, and which facility includes a pharmacy also operated by Kaiser. On information and belief, Defendant Kaiser is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**6. Doctor's Hospital**

74. Defendant Doctor's Hospital is a local hospital facility that provides inpatient and outpatient services located at 8118 Good Luck Road, Lanham, MD, 20706. On information and belief, Defendant Doctor's Hospital is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all

such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**7. Pharmacy Corp. of America dba Pharmerica**

75. Defendant Pharmacy Corp. of America dba Pharmerica ("Pharmerica") is a long-term care full service pharmacy that specializes in senior living settings and assisted living facilities. On information and belief Pharmerica was previously located at 12240 Kiln Court, Beltsville, MD, 20705. On information and belief, Defendant Pharmerica is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

**8. Accokeek Drug**

76. Defendant Accokeek Drug is a local pharmacy located at 15789 Livingston Road, Suite 108, Accokeek, MD, 20607. On information and belief, Defendant Accokeek Drug is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of

Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

### 9. Giant Food Stores, LLC

77. Defendant Giant Food Stores, LLC ("Giant Food") is a Delaware corporation with its principal domestic office at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202. Defendant Giant Food owns and operates several pharmacies located within its chain grocery stores in and around the Towns, including, but not limited to, Giant Food Store #0334 located at 3521 East-West Hwy, Hyattsville, MD, 20782; Giant Food Store #0347 located at 10480 Campus Way, S. Largo, MD, 20774; Giant Food Store #0315 located at 7546 Annapolis Road, Lanham, MD, 20784; Giant Food Store #0140 located at 5815 Eastern Avenue, Hyattsville, MD, 20782; Giant Food Store #0123 located at 7074 Allentown Road, Camp Springs, MD, 20748; Giant Food Store #0373 located at 5500 Silver Hill Road, District Heights, MD 20747; and Giant Food Store #0338 located at 7025 Berry Road, Accokeek, MD 20607. On information and belief, Defendant Giant Food and its pharmacies are top dispensers of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

### 10. Safeway Inc.

78. Defendant Safeway, Inc. ("Safeway") is a California corporation with regional headquarters located at 4551 Martin Luther King Jr. Hwy, Lanham, MD, 20706. Defendant Safeway owns and operates several pharmacies located within its chain grocery stores in and around the Towns, including, but not limited to, Safeway located at 3702 East-West Hwy, Hyattsville, MD, 20782; Safeway located at 7605 Crain Hwy, Upper Marlboro, MD, 20772; Safeway located at 12410 Fairwood Pkwy, Bowie, MD, 20720; Safeway located at 4101 Northview Drive, Bowie, MD, 20716; Safeway located at 6235 Oxon Hill Road, Oxon Hill, MD, 20745; Safeway located at 7595 Greenbelt Road, Greenbelt, MD 20770; Safeway located at 15916 S Crain Hwy, Brandywine, MD, 20613; Safeway located at 990 E Swan Creek Road, Fort Washington, MD, 20744; and Safeway located at 8785 Branch Avenue, Clinton, MD, 20735. On information and belief, Defendant Safeway is a top dispenser of opioids in and around the Towns and have committed and continue to commit serious and flagrant violations of Maryland laws regarding the dispensing of opioids, including—*inter alia*—violations of Code of Maryland Regulations ("COMAR") 10.19.03.03 (requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health), as well as COMAR 10.19.03.12 (requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements).

## E. DOE Defendants

79. The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 1000, inclusive, are unknown to the Municipal Plaintiffs who therefore sue said Defendants by such fictitious names. The full extent of the facts

linking such fictitiously sued Defendants is unknown to the Municipal Plaintiffs. The Municipal Plaintiffs are informed and believe and thereon allege that each of the Defendants designated herein as a DOE was, and is, negligently, recklessly, and/or intentionally responsible for the events and happenings hereinafter referred to, and thereby negligently, recklessly, and/or intentionally legally and proximately caused the hereinafter described injuries and damages to the Towns. The Municipal Plaintiffs will hereafter seek leave of the Court to amend this Complaint to show the fictitiously sued Defendants' true names and capacities, after the same have been ascertained.

## III. JURISDICTION AND VENUE

80. This Court has subject matter jurisdiction by grant of authority under the Constitution of the State of Maryland.

81. This Court has personal jurisdiction over Defendants under the long-arm statute of the State of Maryland, Cts. & Jud. Proc. Art., Md. Code Ann. §6-103, and the United States Constitution, because Defendants have regularly transacted business in Maryland; have purposefully directed business activities to Maryland; and have engaged in unlawful practices and caused injury in Maryland. Each Defendant has promoted, marketed, sold, and/or distributed prescription opioids in the State of Maryland or directed to the State of Maryland.

82. The Manufacturer, Distributor, and Pharmacy Defendants are each registered to do business in Maryland and have generated substantial sums of money through the sale of prescription opioids in Maryland, including in the Towns specifically. The Manufacturer Defendants have also unlawfully promoted their opioids in Maryland, through conduct within the State of Maryland and through other business activities directed into Maryland. Defendant Distributors and Defendant Pharmacies Rite Aid of Maryland, Inc., Dimensions Health Corporation d/b/a University of Maryland Prince George's Hospital Center, Medstar Southern

Maryland Hospital Center, Inc., Doctor's Hospital, Inc., and Accokeek Drug and Health Care, Inc., are Maryland citizens and conduct business and continue to conduct business in the Towns.

83. Venue in this Court is proper because the Municipal Plaintiffs' claims arise, in part, in Prince George's County and each of the Defendants conducts business there.

## IV. FACTUAL ALLEGATIONS

### A. Background on Pain Medicine

84. The practice of medicine centers on informed risk management. Prescribers must weigh the potential risks and benefits of each treatment option, as well as risk of non-treatment. Accordingly, the safe and effective treatment of chronic pain requires that a physician be able to weigh the relative risk of prescribing opioids against both (a) the relative benefits that may be expected during the course of opioid treatment and (b) the risks and benefits of alternatives.

85. Opium has been recognized as a tool to relieve pain for millennia; so has the magnitude of its potential for abuse, addiction, and its dangers. Opioids are related to illegal drugs like opium and heroin. In fact, some types of fentanyl, a widely-distributed opioid in the United States, have now been made illegal in China.

86. During the Civil War, opioids gained popularity among doctors and pharmacists for their ability to reduce anxiety and relieve pain—particularly on the battlefield—and they were popularly used in a wide variety of commercial products ranging from pain elixirs to cough suppressants and beverages. By 1900, an estimated 300,000 people were addicted to opioids in the United States. Both the number of opioid addicts and the difficulty in weaning patients from opioids made clear their highly addictive nature.

87. Due to concerns about their addictive properties, opioids have been regulated since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as the result of an excessive dose.

88. Studies and articles from the 1970s and 1980s also made the reasons to avoid opioids clear. Scientists observed poor outcomes from long-term opioid therapy in pain management programs; opioids' mixed record in reducing pain long-term and failure to improve patients' function; greater pain complaints as most patients developed tolerance to opioids; opioid patients' diminished ability to perform basic tasks; their inability to make use of complementary treatments like physical therapy due to the side effects of opioids; and addiction. Leading authorities discouraged, and even prohibited, the use of opioid therapy for chronic pain.

89. Despite the fact that opioids are now routinely prescribed, there has never been evidence of their safety and efficacy for long-term use. On the contrary, evidence shows that opioid drugs are not effective to treat chronic pain, and may worsen patients' health. Increasing duration of opioid use is strongly associated with an increasing prevalence of mental health conditions (depression, anxiety, post-traumatic stress disorder, or substance abuse), increased psychological distress, and greater health care utilization.

90. Opioids are highly addictive. Patients using opioids for more than a few days can experience severe withdrawal symptoms if they stop taking the drugs, including: anxiety, insomnia, pain, blurry vision, rapid heartbeat, chills, panic attacks, nausea, vomiting, and tremors. Withdrawal can last so long and be so painful that it is difficult to stop taking opioids.

91. Putting patients on opioids puts them at risk. Patients who take opioids at higher doses and longer duration face higher and higher risk of addiction and death. Relative to the general population, the risk of opioid-death is 35 times higher for patients receiving three

consecutive months of opioid therapy. Each of the Defendants named in this Complaint disregarded the well-known and frightening statistics regarding opioid abuse and chose to ignore them in the name of profits.

### B. The Manufacturer Defendants' Impact on the Perception and Prescribing of Opioids

92. Before the Manufacturer Defendants began the marketing campaign complained of herein, the generally accepted standards of medical practice dictated that opioids should only be used short-term, for acute pain, or for patients nearing the end of life. The Manufacturer Defendants changed this perception and took advantage of addiction to make money. The Manufacturer Defendants' marketing campaign resulted in skyrocketing opioid prescriptions. The shocking increase in prescriptions has been a gold mine for the Manufacturer Defendants. It has been a tragedy for patients and the Towns' citizenry. The Towns have lost citizens young and old to the opioid epidemic.

93. Patients who survive addiction need lengthy, difficult, and expensive treatment. People who are addicted to opioids are often unable to work. The addiction of parents can force their children into foster care. Babies are born addicted to opioids, with a condition known as Neonatal Abstinence Syndrome ("NAS"), because they are exposed to the drugs in the womb. Regulators report that the rate of babies born with NAS increased by 50% in Maryland between 1999 and 2012.

### C. The Manufacturer Defendants Engaged in a Deceptive Marketing Scheme to Increase Profits

94. To profit from their highly addictive drugs, the Manufacturer Defendants engaged in deadly and illegal practices to deceive doctors and patients. First, the Manufacturer Defendants

deceived the doctors serving the Towns' residents and their patients to get more people on their highly addictive drugs. Second, the Manufacturer Defendants misled them to take higher and more dangerous doses. Third, the Manufacturer Defendants deceived them to stay on their drugs for longer and more harmful periods of time.

95. The Manufacturer Defendants targeted vulnerable people who could be introduced to opioids, including elderly patients and people who had never taken opioids before. The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. Existing evidence shows that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. Clinical guidelines for opioid therapy cautioned that there are "special risks of long-term opioid use for elderly patients" and recommended that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients.

96. All the while, the Manufacturer Defendants peddled falsehoods to keep patients away from safer alternatives. Even when the Manufacturer Defendants knew people in the Towns were addicted and dying, the Manufacturer Defendants treated doctors and patients as "targets" to sell more drugs.

97. Each part of the scheme earned the Manufacturer Defendants more money from opioid sales and caused more addiction and death in the Towns. From 2012 to 2016, the total economic cost for opioid-related fatalities in Maryland, which includes the Towns, was over $55 billion.[17] In 2016 alone, the economic cost of the opioid epidemic in Maryland, which includes

---

[17] Minority Staff, Senate Committee on Health, Education, Labor, and Pensions, *The Economic Cost of the Opioid Epidemic in Maryland*,

the Towns, was over $21.19 billion.[18] Each Manufacturer Defendant participated in and profited from the opioid scheme in Maryland, and specifically in the Towns, as set forth below.

### D. The Manufacturer Defendants Funneled Misrepresentations Through Sales Representatives, Advertisements, and Third-Parties

98. Patients in the Towns continue to visit emergency rooms and/or die after taking the Manufacturer Defendants' drugs because the Towns were subject to the Manufacturer Defendants' massive deceptive sales campaign. The Manufacturer Defendants deceptively marketed their branded opioids directly to doctors and patients in the Towns. The Manufacturer Defendants also deployed sales representatives to spread their false and misleading statements about the risks and benefits of opioids for the treatment of long-term chronic pain throughout Maryland, including the Towns.

99. These representatives were the Manufacturer Defendants' most powerful tools of deception by using them to conduct face to face meetings with healthcare providers and pharmacists in the Towns in an effort to promote opioids. During sales visits, the Manufacturer Defendants' representatives made false and misleading claims directly to the professionals who care for patients in the Towns. The Manufacturer Defendants assigned representatives to the Towns and adjacent towns and gave them lists of doctors to visit. The "scripts" used by these representatives were approved and closely monitored by the Manufacturer Defendants.

100. Each of these visits cost the Manufacturer Defendants money. But the Manufacturer Defendants made this money back many times over, because they convinced doctors to prescribe their addictive drugs. The Manufacturer Defendants rewarded high prescribing

---

https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Economic%20Cost%20of%20the%20Opioid%20Epidemic%20in%20Maryland.pdf.

[18] *Id.*

doctors with meals, money, and gifts. The Manufacturer Defendants' sales representatives who generated the most prescriptions won bonuses and prizes. These representatives have spread and continue to spread misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors, and other healthcare providers, including those serving or located within the Towns.

101. The Manufacturer Defendants' representatives have been reprimanded for their deceptive promotions. A July 2010 "Dear Doctor" letter mandated by regulators required Actavis to acknowledge to the doctors to whom it marketed its drugs that "[b]etween June 2009 and February 2010, Actavis sales representatives distributed . . . promotional materials that . . . omitted and minimized serious risks associated with [Kadian]," including the risk of "[m]isuse, [a]buse, and [d]iversion of [o]pioids" and, specifically, the risk that "[o]pioid[s] have the potential for being abused and are sought by drug abusers and people with addiction disorders and are subject to criminal diversion."

102. The Manufacturer Defendants also conducted and continue to conduct advertising campaigns touting the purported benefits of their branded drugs. For example, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001. This amount included $8.3 million by Purdue (which is not a defendant herein, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants), $4.9 million by Janssen, and $1.1 million by Endo.

103. A number of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example, since at least May 21, 2011, Endo has distributed and made available on its website, opana.com, a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction workers and chefs,

misleadingly implying that the drug would provide long-term pain-relief and functional improvement. Purdue (which is not a defendant herein, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants) also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin as treatment for each. One ad described a "54-year old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively. Endo and Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but they continue to disseminate them in Maryland.

104. Similarly, despite Subsys' limited indication and the potent danger associated with fentanyl, Insys falsely and misleadingly marketed Subsys to doctors as an effective treatment for back pain, neck pain and other off-label breakthrough pain conditions. As of June 2012, Insys defined "breakthrough pain" in cancer patients to include mild pain: a "flare of mild-to-severe pain in patients with otherwise stable persistent pain," based on a misleading citation to a paper written by Dr. Russell Portenoy.[19] Insys trained and instructed its sales representatives to use the false definition of breakthrough pain and specifically to use a core visual aid, including the improper definition, whenever they detailed Subsys to a healthcare provider or provider's office.

[19] Portenoy's paper, which was featured in the 1990 issue of Pain, actually defined breakthrough pain as "a transitory increase in pain to greater than moderate intensity—i.e., to an intensity of 'severe' or 'excruciating') . . . on a baseline pain of moderate intensity or less." Russell K. Portenoy & Neil A. Hagen, *Breakthrough pain: Definition, prevalence and characteristics*, 41(3) Pain 273-81 (July 1990).

105. According to a 2014 article in *The New York Times*, only 1% of prescriptions for Subsys were written by oncologists. Approximately half the prescriptions were written by pain specialists, with others, including dentists and podiatrists, writing prescriptions as well.[20]

106. On September 6, 2017, Senator Claire McCaskill's report, "Fueling an Epidemic: Insys Therapeutics and the System Manipulation of Prior Authorization" was published. The report found that Insys manipulated the prior authorization process [21] by misleading pharmacy benefit managers about the role of Insys in the prior authorization process and the presence of breakthrough cancer pain in potential Subsys patients.[22]

107. On September 12, 2017, Senator McCaskill convened a Roundtable Discussion on Opioid Marketing. During the hearing, Senator McCaskill stated:

> "The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious addiction. As it turns out these messages were exaggerations at best and outright lies at worst.

* * *

---

[20] Katie Thomas, *Doubts Raised About Off-Label Use of Subsys, a Strong Painkiller*, N.Y. TIMES (May 13, 2014), https://www.nytimes.com/2014/05/14/ business/doubts-raised-aboutoff-label-use-of-subsys-a-strong-painkiller.html.

[21] Prior authorization (PA) is any process by which physicians and other health care providers must obtain advance approval from a health plan before a specific procedure, service, device, supply or medication is delivered to the patient to qualify for payment coverage. (American Medical Association, *Prior authorization: The current landscape*, p. 1 (2015), https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/premium/ psa/prior-authorization-toolkit_0.pdf.

[22] HSGAC Minority Staff Report, Insys Therapeutics and the Systemic Manipulation of Prior Authorization (2017).

> "Our national opioid epidemic is complex, but one explanation for this crisis is simple, pure greed."[23]

108. Less than two years later, Insys' former chief executive officer pleaded guilty to participating in a nationwide scheme to bribe doctors in exchange for prescribing Subsys.[24]

109. The Manufacturer Defendants[25] also identified doctors to serve, in exchange for payment, on their speakers' bureaus and to attend programs with speakers and meals paid for by the Manufacturer Defendants. These speaker programs provided: (1) an incentive for doctors to prescribe a particular opioid (so they might be selected to promote the drug); (2) recognition and compensation for the doctors selected as speakers; and (3) an opportunity to promote the drug through the speaker to his or her peers. These speakers gave the false impression that they were providing unbiased and medically accurate presentations when they were, in fact, reciting a script prepared by the Manufacturer Defendants. On information and belief, these presentations conveyed misleading information, omitted material information, and failed to correct the Manufacturer Defendants' prior misrepresentations about the risks and benefits of opioids.

110. Each Manufacturer Defendant devoted and continues to devote massive resources to direct sales contacts ("detailing") with doctors. In 2014 alone, the Manufacturer Defendants spent $168 million on detailing branded opioids to doctors. This amount is twice as much as the Manufacturer Defendants spent on detailing in 2000. The amount includes $34 million by Janssen, $10 million by Endo, and $2 million by Actavis.

---

[23] *See*, *LIVESTREAM: Insys Opioid Sales and Marketing Practices Roundtable*, September 12, 2017, at 31:03-31:37, https://www.youtube.com/watch?v=k9mrQa8_vAo (last accessed Mar. 17, 2019).

[24] Nate Raymon, Former Insys CEO pleads guilty to opioid kickback scheme, REUTERS (Jan. 9, 2019), https://www.reuters.com/article/us-insys-opioids/former-insys-ceo-pleads-guilty-to-opioid-kickback-scheme-idUSKCN1P312L

[25] Upon information and belief, Actavis continued to carry out speaker programs after it acquired Kadian.

111. The Manufacturer Defendants also deceptively marketed opioids in Maryland through unbranded advertising—*i.e.*, advertising that promotes opioid use generally but does not name a specific opioid. This advertising was ostensibly created and disseminated by independent third parties. But by funding, directing, reviewing, editing, and distributing this unbranded advertising, the Manufacturer Defendants controlled the deceptive messages disseminated by these third parties and acted in concert with them to falsely and misleadingly promote opioids for the treatment of chronic pain.[26]

112. The Manufacturer Defendants marketed through third-party, unbranded advertising to avoid regulatory scrutiny because such advertising is not submitted to and typically not reviewed by regulators. The Manufacturer Defendants also used third-party, unbranded advertising to give the false appearance that the deceptive messages came from an independent and objective source. Like tobacco companies, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

113. The Manufacturer Defendants' deceptive unbranded marketing often contradicted what they said in their branded materials reviewed by regulators. For example, Endo's unbranded advertising contradicted its concurrent, branded advertising for Opana ER:

| **Pain: Opioid Therapy (Unbranded)** | **Opana ER Advertisement (Branded)** |
|---|---|
| "People who take opioids **as prescribed usually do not become addicted.**" | "All patients treated with opioids require careful monitoring for signs of abuse and addiction, since **use of opioid analgesic products carries the risk of addiction even under appropriate medical use.**" |

[26] The phrase "acted in concert" includes conspiring to achieve some end and aiding and abetting in the commission of acts necessary to achieve some end.

114. The Manufacturer Defendants also spoke through a small circle of doctors who, upon information and belief, were selected, funded, and elevated by the Manufacturer Defendants because their public positions supported the use of opioids to treat chronic pain. These doctors became known as "key opinion leaders" or "KOLs." The Manufacturer Defendants paid these KOLs to serve as consultants or on their advisory boards and to give talks or present continuing medical education programs ("CMEs"), and their support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain, repaying the Manufacturer Defendants by advancing their marketing goals. KOLs' professional reputations became dependent on continuing to promote a pro-opioid message, even in activities that were not directly funded by the Manufacturer Defendants.

115. Pro-opioid doctors are one of the most important avenues that the Manufacturer Defendants use to spread their false and misleading statements about the risks and benefits of long-term opioid use for chronic pain. The Manufacturer Defendants know that doctors rely heavily and more uncritically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for chronic opioid therapy. For example, the New York Attorney General ("NY AG") found in its settlement with Purdue, which is owned and controlled by the Sackler family (neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants), that through March 2015, the Purdue website, "In the Face of Pain," failed to disclose that doctors who provided testimonials on the site were paid by Purdue and concluded that Purdue's failure to disclose these financial connections potentially misled consumers regarding the objectivity of the testimonials. KOLs have written, consulted on, edited, and lent their names to books and articles, and have given speeches and CMEs supportive of chronic opioid therapy. The various

Manufacturer Defendants created opportunities for KOLs to participate in research studies Defendants suggested or chose and then cited and promoted favorable studies or articles by their KOLs. By contrast, the Manufacturer Defendants did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic opioid therapy.

116. The Manufacturer Defendants' KOLs also served on committees that developed treatment guidelines that strongly encourage the use of opioids to treat chronic pain and on the boards of pro-opioid advocacy groups and professional societies that develop, select, and present CMEs. These guidelines and CMEs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today. The Manufacturer Defendants were able to direct and exert control over each of these activities through their KOLs. The medical community at large as well as several regulatory agencies and government entities confirm and recognize that treatment guidelines can "change prescribing practices."

117. The Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of Defendants, these "Front Groups"—which include, but are not limited to, the American Pain Foundation ("APF") and the American Academy of Pain Medicine—generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. These guidelines, materials, and programs were not supported by the scientific evidence at the time they were created, and they are not supported by the scientific evidence today. These Front Groups also assisted the Manufacturer Defendants by responding to negative articles, by advocating against regulatory changes that would limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

118. These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for survival. Defendants also exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. Despite this, the Front Groups held themselves out as independent and serving the needs of their members—whether patients were suffering from pain or doctors were treating those patients.

119. The Manufacturer Defendants worked together, through Front Groups, to spread their deceptive messages about the risks and benefits of long-term opioid therapy. For example, the Manufacturer Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Endo, Janssen/J&J, and Purdue[27]) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that a legally-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers, which the Manufacturer Defendants determined would reduce prescribing. PCF also worked to address a perceived "lack of coordination" among its members and developed "key" messages that were disseminated in programs and industry-run websites.

### E. The Manufacturer Defendants Deceived Health Care Providers and Patients to Get More People on Highly Addictive Drugs, at Higher Doses, for Longer Periods

120. To convince prescribers and patients around the country, including in Maryland, that opioids can and should be used to treat chronic pain, the Manufacturer Defendants had to convince them that long-term opioid use is both safe and beneficial. The Manufacturer Defendants

[27] Purdue is not a Defendant herein.

deceived those doctors and patients about the risks and benefits of long-term opioid use. The Manufacturer Defendants, through Front Groups, KOLs, and advertisements, made claims that were not supported by or were contrary to the scientific evidence—most frequently, these claims downplayed the risks of addiction in order to convince patients and doctors alike that prescription opioids should be used more regularly. Even though pronouncements by and guidance from regulators based on that evidence confirm that their claims were false and misleading, the Municipal Plaintiffs are informed and believe that the Manufacturer Defendants have not corrected them and continue to spread them today, including as set forth specifically below.

**1. Deception About Addiction**

121. The Manufacturer Defendants always knew that their opioids carry grave risks of addiction and death. Instead of being honest about these risks, the Manufacturer Defendants obscured them, including by falsely stating and implying that "appropriate patients" won't get addicted. To convince doctors and patients that opioids are safe, the Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by regulators and the medical community at large.

122. First, the Manufacturer Defendants falsely claimed that the risk of addiction is low and that addiction is unlikely to develop when opioids are prescribed, as opposed to obtained illicitly; and failed to disclose the greater risk of addiction with prolonged use of opioids. Some illustrative examples of these false and misleading claims that were made by, are continuing to be made by, and/or have not been corrected by the Manufacturer Defendants after May 21, 2011, are described below:

a. Actavis' predecessor caused a patient education brochure to be distributed in 2007 that claimed opioid addiction is possible, but "less likely if you have never

had an addiction problem." Upon information and belief, based on Actavis's acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use this brochure in 2009 and beyond.

b. Purdue, which is owned and controlled by the Sacklers (neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants), and Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which instructed that addiction is rare and limited to extreme cases of unauthorized dose escalations, obtaining duplicative opioid prescriptions from multiple sources, or theft.

c. Endo sponsored a website, Painknowledge.com, which claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them."

d. Endo and Cephalon distributed a pamphlet with the Endo logo entitled Living with Someone with Chronic Pain, which stated that: "Most health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

e. Janssen/J&J reviewed, edited, approved, and distributed a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain."

f. Janssen ran a website, Prescriberesponsibly.com (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."

g. Purdue, which is owned and controlled by the Sacklers (neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants), sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]."

h. Detailers for Purdue, Endo, Teva, and Janssen in Maryland have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in Maryland, including in the Towns, about the risk of addiction; falsely claiming that abuse-deterrent formulations "cannot be crushed," downplaying the potential that these opioids could be abused; and routinely did

not correct the misrepresentations noted above.

123. Moreover, Purdue, in a pamphlet for doctors, *Providing Relief, Preventing Abuse: A Reference Guide to Controlled Substance Prescribing Practices*, wrote that addiction "is not caused by drugs." Instead, Purdue, which is owned and controlled by the Sacklers (neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants), assured doctors that addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a susceptible individual by exposure to drugs, most commonly through abuse."[28]

124. Purdue, which is owned and controlled by the Sacklers (neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants), also promoted its opioids to patients in the Towns with marketing that was designed to obscure the risk of addiction and even the fact that Purdue was behind the campaign. Purdue created a website, *In the Face of Pain*, that promoted pain treatment by urging patients to "overcome" their "concerns about addiction." Testimonials on the website that were presented as personal stories were in fact by Purdue consultants, whom Purdue had paid tens of thousands of dollars to promote its drugs.[29]

125. Another Purdue publication – which is owned and controlled by the Sacklers – neither of which/whom are defendants in this case, was the *Resource Guide for People with Pain*, falsely assured patients and doctors that opioid medications are not addictive:

> "*Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that*

---

[28] Purdue Pharma LP, *Providing Relief, Preventing Abuse* (2008), pg. 12; *see also* K. Nelson, *Purdue Pharma lawsuit: Terms you need to know to understand OxyContin blitz*, Knox News (July 13, 2018), https://www.knoxnews.com/story/news/health/2018/07/13/purdue-pharma-lawsuit-terms-know-understand-oxycontin-blitz/779173002/.

[29] Purdue Pharma LP, *In the Face of Pain* (Oct. 24, 2011).

> *when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a 'high'.*"[30]

126. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, falsely denied the risk of addiction, falsely implied that addiction requires patients to get "high," and falsely promised that patients would not get addicted if they took opioids as prescribed.

127. Purdue (which is not a defendant in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named manufacturer defendants) funded and distributed many more publications that were similarly misleading. *Exit Wounds* misleadingly claimed: "Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."[31]

128. Similarly, while Janssen/J&J repeatedly disclaimed responsibility for its part in causing the opioid crisis, insisting that "[e]verything that we have done with our products when we've promoted opioid products . . . was appropriate and responsible," internal memoranda and communications between high-level executives at Janssen show the company funded and pushed bogus research to lend false credibility to a series of dangerous fictions, claiming that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain," and enabling "Janssen's representatives [to] promote[] Nucynta and Nucynta ER as safer, milder, and less addictive than competitor opioids like OxyContin."[32]

---

[30] Purdue Pharma LP, *Resource Guide for People with Pain*, p. 8 (2009).

[31] Purdue Pharma LP, *Exit Wounds*, p. 107 (2009).

[32] M. Aron, *Deceptively marketing opioids*, NJTV News (Nov. 13, 2018), https://www.njtvonline.org/news/video/state-sues-johnson-johnson-subsidiary-for-deceptively-marketing-opioids/.

129. In 2017, Mallinckrodt agreed to settle, for $35 million, allegations regarding excessive sales of oxycodone in Florida. According to these allegations, even though Mallinckrodt knew that its oxycodone was being diverted for illicit use, it nonetheless continued to incentivize and supply these suspicious sales, and it failed to notify regulators of the suspicious orders in violation of its obligations. Similarly, in 2008, Cephalon pleaded guilty to criminal violations for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

130. In August 2019, Johnson & Johnson was found liable of (a) having engaged in false and misleading marketing of both their drugs and opioids more generally, and (b) creating, contributing to, and perpetuating a public nuisance under Oklahoma law. This determination resulted in a $572 million verdict that represents just one year of abatement expenses in one state.

131. Over and over, Defendants said opioids could be given to "trusted" patients without risk of addiction. To promote their drugs, the Manufacturer Defendants pushed the myth that addiction is a character flaw, and "trustworthy" people do not get addicted to drugs.

132. These claims are contrary to longstanding scientific evidence and recently established clinical guidelines for opioid therapy. These guidelines provide that there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The guidelines indicate that "[o]pioid pain medication use presents serious risks, including . . . opioid use disorder" and that "continuing opioid therapy for 3 months substantially increases risk for opioid use disorder."

133. The falsity of the Manufacturer Defendants' claims about the low risk of addiction was further exposed when regulators announced changes to the labels for ER/LA opioids in 2013 and for IR opioids in 2016. These announcements emphasized that "most opioid drugs have 'high potential for abuse'" and that opioids "are associated with a substantial risk of misuse, abuse,

NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." Thus, because of the "known serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, even at recommended doses, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. These regulators further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

134. The New York Attorney General, in a 2016 settlement agreement with Endo, found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder." Endo had claimed until at least April 2012 on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," but the NY AG found that Endo had no evidence for that statement. Consistent with this, Endo agreed not to "make statements that . . . opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. On information and belief, Endo made similar representations to healthcare providers and patients in and around the Towns. However, Endo has not yet been restricted from making these statements in Maryland.

### 2. Deception to Get Vulnerable Patients on Opioids

135. To expand the market for opioids, the Manufacturer Defendants also trained their representatives to target vulnerable populations and encourage doctors to put them on opioids, without disclosing the risks. The Manufacturer Defendants deceptively promoted opioids for elderly patients, patients who had never taken opioids, and patients with osteoarthritis—putting thousands of more patients at risk.

**Elderly Patients**

136. The Manufacturer Defendants knew that prescribing opioids to elderly patients increase their risk of death. Elderly patients are at a greater risk of dangerous interactions between drugs. They are also at a greater risk of respiratory depression—in which patients suffocate and die. But the Manufacturer Defendants saw the opportunity to earn millions of dollars by getting elderly patients on opioids because the public would pay through Medicare. For instance, Purdue's (not a defendant herein) internal documents show it targeted "Patients over the age of 65 as more . . . coverage is achieved."[33]

**Opioid-Naïve Patients**

137. The Manufacturer Defendants also targeted patients who were not already taking opioids, described in the field as "opioid-naïve." The Manufacturer Defendants unfairly and deceptively marketed their drugs as appropriate treatments for opioid-naïve patients, without disclosing that they face even higher risks of overdose and death.

138. The Manufacturer Defendants also found vulnerable opioid-naïve patients by targeting prescribers with the least training in the risks of opioids. The Manufacturer Defendants determined that nurse practitioners, physician assistants, and primary care doctors were especially responsive to sales reps, so the Manufacturer Defendants targeted them to sell more drugs.

**Osteoarthritis Patients**

139. The Manufacturer Defendants knew or should have known that opioids were not appropriate to treat nonmalignant pain in non-cancer patients, including patients suffering from osteoarthritis. Opioids are not approved to treat osteoarthritis.

---

[33] Purdue Pharma LP, *Pain Products Presentation*, p. 12 (Jan. 28, 2015).

140. Nevertheless, to meet their business goals, the Manufacturer Defendants trained their sales representatives to mislead healthcare providers and patients by promoting opioids for osteoarthritis.

141. The Manufacturer Defendants also directed their sales reps to use marketing materials that highlight patients with osteoarthritis, even though their drugs were never indicated for that disease.

### 3. The Manufacturer Defendants Deceived Doctors and Patients to Use Higher and Higher Doses

142. The impetus behind the Manufacturer Defendants' scheme is as simple as it is nefarious. Enticed by the exponentially greater profits that would result from increases in opioid dose mix, the Manufacturer Defendants deceived prescribing medical practitioners and patients across the country—and in the Towns—about the risks and benefits of opioids for the long-term treatment of chronic pain. The Manufacturer Defendants dishonestly encouraged these prescribers to provide long-term opioid therapy to patients for whom such treatment was inappropriate, such as patients suffering from long-term chronic pain due to osteoarthritis. As set forth below, the Manufacturer Defendants' deceptive scheme was wildly successful, increasing the supply of highly addictive prescription opioids, both in the State of Maryland generally and in the Towns, specifically.

143. The Manufacturer Defendants—including, but not limited to, Defendant Endo—also falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. Defendants called this phenomenon "pseudoaddiction"—a made-up, misleading and scientifically unsubstantiated term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Dr. Russell Portenoy, a KOL for Endo, Janssen, Teva, and Purdue. Through aggressive marketing campaigns

to prescribers and patients in and around the Towns, the Manufacturer Defendants used the concept of "pseudoaddiction" as a lever to mislead prescribers and their patients into believing that certain warning signs of opioid addiction[34] were neither indicative of "true" addiction nor cause for alarm. To the contrary, the Manufacturer Defendants repeatedly claimed these warning signs were manifestations of undertreated pain, which should be addressed by prescribing more opioids. Importantly, at all times relevant to this action, the Manufacturer Defendants both knew the concept of "pseudoaddiction" was false and yet actively sought to conceal the truth from physicians and patients in the Towns, sabotaging these prescribers' ability to protect their patients from opioid addiction and concomitant injuries and make informed decisions about whether or not opioids were appropriate for their patients. Some illustrative examples of these deceptive claims that were made by, are continuing to be made by, and/or have not been corrected by the Manufacturer Defendants are described below:

a. Cephalon, Endo, and Purdue[35] sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. *Responsible Opioid Prescribing* remains for sale online.

b. Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain is under-treated . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

c. Endo sponsored a National Initiative on Pain Control (NIPC) CME program in 2009 titled *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia*, which promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

---

[34] *E.g.*, demanding more opioids, engaging in manipulative behavior to obtain drugs, requesting specific drugs, hoarding drugs during periods of reduced symptoms, using drugs to treat another symptom, etc.

[35] Not a Defendant herein.

d. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, published a pamphlet in 2011 entitled *Providing Relief, Preventing Abuse*, which described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug-seeking behaviors] in patients who have pain that has not been effectively treated."

e. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, sponsored a CME program entitled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse" in 2011. In a role play exercise, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long-acting opioid.

f. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, and Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated . . . Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."

144. The medical community now rejects the concept of pseudoaddiction, and does not recommend that opioid dosages be increased if a patient is not experiencing pain relief. To the contrary, widely accepted opioid treatment guidelines now state that "[p]atients who do not experience clinically meaningful pain relief early in treatment . . . are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

145. Even one of the Manufacturer Defendants has effectively repudiated the concept of pseudoaddiction. In finding that "[t]he pseudoaddiction concept has never been empirically

validated and in fact has been abandoned by some of its proponents," the NY AG, in its 2016 settlement with Endo, reported that "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.' "[36] Consistent with this testimony, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York.[37]

146. The Manufacturer Defendants also falsely promised prescribers and their patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies would both allow these prescribers to reliably identify and safely prescribe opioids to patients who are predisposed to addiction and be efficacious enough to essentially rule out the risk of opioid addiction (even in the context of long-term opioid therapy). These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Some illustrative examples of these deceptive claims that were made by, are continuing to be made by, and/or have not been corrected by the Manufacturer Defendants after March 21, 2011 are described below:

a. Endo paid for a 2007 supplement in the Journal of Family Practice written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

---

[36] In the Matter of Endo Health Solutions Inc., *et al.*, Assurance No. 15-228, p. 7, ¶ 23 (NY AG, Mar. 1, 2016), https://www.ag.ny.gov/pdfs/ENDO_AOD_030116-Fully_Executed.pdf.

[37] *Id.*, p. 15, ¶ 41.e.

b. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, sponsored a November 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

c. As recently as 2015, Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, has represented in scientific conferences that "bad apple" patients—and not opioids—are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

147. Consistent with what the Manufacturer Defendants already knew but failed to disclose at all times relevant to this action, widely accepted opioid treatment guidelines now confirm that the Manufacturer Defendants' statements were false, misleading, and unsupported at the time they were made by the Manufacturer Defendants. These guidelines note that there are no studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse—"for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, opioid treatment guidelines now recognize that available risk screening tools "show insufficient accuracy for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that prescribers "*should not overestimate* the ability of these tools to rule out risks from long-term opioid therapy." (Emphasis added.)

**4. The Manufacturer Defendants Peddled Falsehoods to Keep Patients Away from Safer Alternatives**

**A. Deception about Quality of Life**

148. The Manufacturer Defendants also steered patients away from safer alternatives with the false claim that its opioids improve patients' "quality of life."

**B. Deception about Risk of Abuse**

149. In addition to visiting prescribers and pharmacists hundreds of thousands of times, the Manufacturer Defendants distributed thousands of copies of its deceptive publications, including *Providing Relief, Preventing Abuse*; *Resource Guide for People with Pain*; *Exit Wounds*; *Opioid Prescribing: Clinical Tools and Risk Management Strategies*; *Responsible Opioid Prescribing*; *Clinical Issues in Opioid Prescribing;* and *In The Face of Pain.*

**5. The Manufacturer Defendants Downplayed Opioids Withdrawal**

150. To downplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use. For example, a 2011 non-credit educational program sponsored by Endo, entitled "Persistent Pain in the Older Adult," claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur. This publication was available on APF's website until the organization dissolved in May 2012. Detailers for Janssen have told and continue to tell doctors in Maryland, including the Towns, that their patients would not experience withdrawal if they stopped using opioids.

151. The Manufacturer Defendants deceptively minimized the significant symptoms of opioid withdrawal that, per widely accepted opioid treatment guidelines, include drug craving,

anxiety, insomnia, abdominal pain, vomiting, diarrhea, sweating, tremor, rapid heartbeat, spontaneous abortion and premature labor in pregnant women, and the unmasking or exacerbating of anxiety, depression, and addiction.

152. The Manufacturer Defendants also grossly understated the difficulty of tapering, particularly after long-term opioid use. Widely accepted opioid treatment guidelines now emphasize that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for more than a few days." These guidelines further state that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. Likewise, regulators have acknowledged the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

153. Some prescribers and many patients in the Towns relied on the truth of the Manufacturers Defendants' representations about both the benefits of opioid analgesics and the risks of opioid addiction. Because each of the Manufacturer Defendants willfully or recklessly concealed the truth about their products and knew or should have known their representations were false at the time they were made, the citizens of the Towns are forced to pay the price for Defendants' misconduct.

### 6. The Manufacturer Defendants Hid the Greater Risks to Patients at Higher Dosages of Opioids

154. The Manufacturer Defendants were in the best position to know, and in fact did know, that—relative to the general population—the risk of opioid-related death increases exponentially after a patient takes opioids for several consecutive months.

155. Specifically, the Manufacturer Defendants falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to the Manufacturer Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims that were made by, are continuing to be made by, and/or have not been corrected by the Manufacturer Defendants after May 21, 2011, are described below:

a. Actavis' predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Upon information and belief, based on Actavis' acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

b. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, and Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.[38]

---

[38] The Manufacturer Defendants frequently contrasted the lack of a ceiling dosage for opioids with the risks of a competing class of analgesics: over-the-counter nonsteroidal anti-inflammatories (or NSAIDs). The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids. (*See, e.g.*, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain* (Endo) (describing massive gastrointestinal

c. Endo sponsored a website, painknowledge.com, which claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain." The website was still accessible online after May 21, 2011.

d. Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics*, which was still available after May 21, 2011 on Endo's website. In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased. . . . You won't 'run out' of pain relief."

e. Janssen sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f. Through March 2015, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, sponsored a CME entitled *Overview of Management Options* that is still available for CME credit. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

156. Through a series of internal strategy presentations and other communications with its sales force and prescriber-accomplices, the Manufacturer Defendants aimed to "drive" patients toward higher doses of opioids for longer periods by dramatically increasing the supply. They also sought to increase consumer demand for opioids, namely by offering discounts to patients on their first prescriptions. These discounts proved to be one of the most powerful tactics to keep patients on opioids longer.

---

bleeds from long-term use of NSAIDs and recommending opioids); *Finding Relief: Pain Management for Older Adults* (Janssen) (NSAIDs caused kidney or liver damage and increased risk of heart attack and stroke, versus opioids, which cause temporary "upset stomach or sleepiness" and constipation).)

Drive appropriate titration and length of therapy with continuing patients, to maintain total Kg within 2% of forecast

*Purdue internal strategy presentation from 2012*

157. These claims conflict with the scientific evidence, as confirmed by widely accepted opioid treatment guidelines. These guidelines explain that the "[b]enefits of high-dose opioids for chronic pain are not established," and the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, these guidelines explain that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." Opioid treatment guidelines also states that "there is an increased risk for opioid use disorder, respiratory depression, and death at higher dosages because the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." Specifically, the clinical research "appear[s] to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." In fact, a recent study found that 92% of persons who died from an opioid-related overdose were initially prescribed opioids for chronic pain. In light of this evidence, prescribing clinicians are now advised to "avoid increasing dosages" above 90 morphine milligram equivalents ("MMEs") per day.

158. Finally, the Manufacturer Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioids has created false impressions that these opioids can prevent and curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

159. These abuse-deterrent formulations ("AD opioids") are harder (but not impossible) to crush, chew, or grind; become gelatinous when combined with a liquid, making them harder to inject; or contain a counteragent such as naloxone that is activated if the tablets are tampered.

Though at all times relevant to this action, the Manufacturer Defendants falsely claimed that AD opioids "cannot be crushed," these claims were conclusively debunked by a study, finding that AD opioids are, in fact, "not impossible" to abuse. They can be defeated—often quickly and easily—by those determined to do so. Moreover, they do not stop oral intake, the most common avenue for opioid misuse and abuse, and do not reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term as prescribed or who escalate their use by taking more pills or higher doses.

160. Because of these significant limitations on AD opioids and because of the heightened risk for misconceptions and for the false belief that AD opioids can be prescribed safely, regulators have admonished the Manufacturer Defendants that any communications from the sponsor companies regarding AD properties must be truthful and not misleading (based on a product's labeling), and supported by sound science taking into consideration the totality of the data for the particular drug. Claims for AD opioid products that are false, misleading, and/or insufficiently proven do not serve the public health.[39]

161. Despite this admonition, the Manufacturer Defendants have made and continue to make misleading claims about the extent to which their AD opioids can prevent or reduce abuse and addiction.

162. For example, Endo has marketed Opana ER as tamper- or crush-resistant and less prone to misuse and abuse since at least May 21, 2011 even though: (1) Endo's petition to approve Opana ER as abuse-deterrent was rejected in 2012; (2) regulators found in 2013 that there was no

[39] *See* U.S. Food and Drug Administration ("FDA"). *Abuse-Deterrent Opioids—Evaluation and Labeling: Guidance for Industry*, p. 23 (Apr. 2015), https://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/guidances/ucm334743.pdf.

evidence that Opana ER "would provide a reduction in oral, intranasal or intravenous abuse"; and (3) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed—contrary to Endo's claims about Opana ER's abuse-deterrent properties. Indeed, Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that Opana ER could not be crushed, creating the impression that the drug was more difficult to abuse. On information and belief, detailers for Endo continue to reiterate these false statements to Maryland prescribers and patients, including prescribers and patients in and around the Towns.

163. In the 2016 settlement with the NY AG, Endo agreed not to make statements in New York that Opana ER was "designed to be, or is crush resistant." The NY AG found those statements false and misleading because there was no difference in the ability to extract the narcotic from Opana ER. The NY AG also found that Endo failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to formulary committees and pharmacy benefit managers.

164. Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in 2017, regulators recommended that Endo withdraw Opana ER from the market.

165. Likewise, Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, but which engaged in the kind of conduct that inspired and informed the conduct of other named Manufacturer Defendants, has engaged and continues to engage in deceptive marketing of its AD opioids—*i.e.*, reformulated Oxycontin and Hysingla—since at least May 21, 2011. Before April 2013, Purdue did not market its opioids based on their abuse-deterrent properties. However, Maryland prescribers report that detailers from Purdue have regularly used the so-called abuse-deterrent properties of Purdue's opioid products as a primary

selling point to differentiate those products from their competitors. Specifically, these detailers: (1) claim that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (2) claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (3) Purdue's AD opioids are "safer" than other opioids; and (4) fail to disclose that Purdue's AD opioids do not impact oral abuse or misuse and that its abuse-deterrent properties can be defeated.

166. These statements and omissions by Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case (but which engaged in the kind of conduct that inspired and informed the conduct of the name Manufacturer Defendants), are false and misleading and conflict with or are inconsistent with the label for Purdue's AD opioids—which indicates that abusers do seek them because of their high likability when snorted, that their abuse deterrent properties can be defeated, and that they can be abused orally notwithstanding their abuse-deterrent properties and which does not indicate that AD opioids prevent or reduce abuse, misuse, or diversion.

167. A 2015 study also shows that many opioid addicts are abusing AD opioids through oral intake or by defeating the abuse-deterrent mechanism. Indeed, one-third of the patients in the study defeated the abuse-deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[40] Despite this, J. David Haddox, the Vice President of Health Policy for Purdue, falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.

[40] Cicero, Theodore J., and Matthew S. Ellis, *Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin*, 72.5 JAMA Psychiatry, 424-30 (2015).

168. Similarly, widely accepted clinical guidelines for opioid therapy state that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies "do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by nonoral routes." Regulatory agencies have further reported that their staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[41]

169. These false and misleading claims about the abuse-deterrent properties of their opioids are especially troubling. First, the Manufacturer Defendants are using these claims in a spurious attempt to rehabilitate their image as responsible opioid manufacturers. Second, these claims are falsely targeting doctors and other prescribing clinicians' concerns about the toll caused by the explosion in opioid prescriptions and use and encouraging doctors to prescribe AD opioids under the mistaken belief that these opioids are safer, even though they are not. Finally, these claims are causing doctors to prescribe more AD opioids—which are far more expensive than other opioid products even though they provide little or no additional benefit.

170. These numerous, longstanding misrepresentations of the risks of long-term opioid use spread by Defendants successfully convinced doctors and patients to discount those risks.

### 7. The Manufacturer Defendants Grossly Overstated the Benefits of Chronic Opioid Therapy

171. To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was a significant upside to long-term opioid use. However, widely accepted clinical guidelines for opioid therapy now make it clear that there is "insufficient evidence to determine the long-term benefits of opioid therapy for chronic pain." (Emphasis added.) In fact, these guidelines found that "[n]o evidence shows a

[41] Perrone, *Drugmakers push profitable, but unproven, opioid solution* (Dec. 15, 2016).

long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials $\leq$ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.

172. Likewise, regulators recognize the lack of evidence to support long-term opioid use. In 2013, for instance, one regulator stated it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks." Despite this, the Manufacturer Defendants falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence. On information and belief, not only have the Manufacturer Defendants failed to correct these false and misleading claims, they continue to make them today in Maryland and in the Towns.

173. For example, the Manufacturer Defendants falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples of these deceptive claims that were made by, are continuing to be made by, and/or have not been corrected by the Manufacturer Defendants after May 21, 2011 are described below:

a. Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b. Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c. Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, ran a series of advertisements for OxyContin in 2012 in medical journals entitled "Pain vignettes," which were case studies featuring patients with pain conditions persisting over several months and recommending OxyContin for them. The ads implied that OxyContin improves patients' function.

e. *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo, Cephalon and Purdue, taught that relief of pain by opioids, by itself, improved patients' function.

f. Purdue, which is owned and controlled by the Sacklers, neither of which/whom are defendants in this case, and Cephalon sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which counseled patients that opioids "give [pain patients] a quality of life we deserve."

g. Endo's NIPC website painknowledge.com claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy. The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

h. Endo was the sole sponsor, through NIPC, of a series of non-credit educational programs titled *Persistent Pain in the Older Patient*, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

i. Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming that opioids allowed a patient to "continue to function."

j. In a 2015 video on Forbes.com discussing the introduction of Hysingla ER, Purdue's Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including Purdue's opioids, to chronic pain patients' "quality of life," and complained that government statistics do not take into account that patients could be driven to suicide without pain relief.

k. Since at least May 21, 2011, sales representatives for Endo, Teva, and Janssen have conveyed and continue to convey to prescribers in Maryland, including in and around the Towns, the message that opioids will improve patient function.

174. These claims find no support in the scientific literature. Regulators and industry stakeholders have made this clear for years. Most recently, widely accepted clinical guidelines for opioid therapy concluded "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely." As illustrated below, this conclusion is reinforced throughout these guidelines:

- *"No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . ."*
- *"Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."*
- *"[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."*

175. Industry guidelines for opioid therapy also note that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

176. Consistent with these guidelines, regulators have also repudiated Defendants' claim that opioids improved function and quality of life. In 2010, for instance, regulators warned Actavis, in response to its advertising described above, that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience ... results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life." And in 2008, regulators sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience

an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

177. The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, the Manufacturer Defendants, before and after May 21, 2011, have overstated the number of deaths from NSAIDs and have prominently featured the risks of NSAIDs, while minimizing or failing to mention the serious risks of opioids. Once again, these misrepresentations by the Manufacturer Defendants contravene widely accepted clinical guidelines for opioid therapy as well as pronouncements by and guidance from regulators. Indeed, in 2013, the labels for ER/LA opioids were changed to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate." An identical change was made to the labels of IR opioids in 2016. And widely accepted clinical guidelines for opioid therapy expressly state that NSAIDs—not opioids—should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

**8. The Manufacturer Defendants Engaged in Other Unlawful and Unfair Misconduct**

178. For over a decade, the Manufacturer Defendants have been able to track the distribution and prescribing of their opioids down to the retail- and prescriber-levels. Using—*inter alia*—their extensive networks of sales representatives and private databases containing years of prescribing data, the Manufacturer Defendants had and continue to have intimate knowledge of the prescribing practices of thousands of prescribing clinicians in Maryland, including clinicians in and around the Towns.

179. In stark contrast to repeated admonitions from regulators regarding the Manufacturer Defendants' "obligation to design and operate a system to disclose . . . suspicious orders of controlled substances" and to inform regulators "of suspicious orders when discovered," the Manufacturer Defendants have improperly leveraged their respective sales networks and prescribing databases to identify and improperly increase marketing efforts to prescribers who have inappropriately prescribed the Manufacturer Defendants' opioids, without reporting these prescribers to the appropriate authorities. As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services, said in a Los Angeles Times article, "[a]ny drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it."

180. For instance, Defendant Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the NY AG found that Endo failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list. The NY AG also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids after May 21, 2011, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

181. In 2000, Mylan agreed to pay $100 million to resolve allegations that it conspired to deny its competitors certain necessary ingredients to manufacture several widely-prescribed medications, including treatments for opioid use disorder and opioid addiction. As alleged in

petitions filed by thirty-two State Attorneys General and the District of Columbia, Mylan's conduct caused substantial price increases in, and improperly limited the supply of, these treatments.

182. In 2013, West-Ward was forced to pay penalties for shirking the company's legal obligation to make timely payments to drug discount programs that provide vulnerable patient populations with affordable access to pharmaceuticals, and also agreed to pay $10,000,000.00 to resolve allegations that West-Ward had also been inflating prescription drug prices since 1995, effectively overcharging some of its most vulnerable patient populations.

183. In addition, Manufacturer Defendant Hospira has been cited by regulatory agencies for both failing to operate its manufacturing facilities in compliance with basic health and safety guidelines intended to prevent microbiological contamination of Hospira's products—including opioids—and for failing to investigate known defects in its products.

184. Despite the clear consequences for their misconduct, for years the Manufacturer Defendants' sales representatives have pressed prescribing clinicians to prescribe their opioids, offering various gifts, rewards and/or other financial incentives to prescribers, to persuade these clinicians to help the Manufacturer Defendants facilitate their widespread deception about the risks and benefits of opioids for the long-term treatment of chronic pain. Indeed, on information and belief, the Manufacturer Defendants' misconduct is ongoing as they continue to profit from the prescriptions of such prolific prescribers in Maryland, including in and around the Towns.

### F. Although the Manufacturer Defendants Knew That Their Marketing of Opioids Was False and Misleading, They Fraudulently Concealed Their Misconduct

185. The Manufacturer Defendants, both individually and collectively, made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain

even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. Regulators warned the Manufacturer Defendants of this. The Manufacturer Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths—all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, regulators have issued pronouncements based on the medical evidence that conclusively expose the known falsity of the Manufacturers Defendants' misrepresentations, and Endo and Purdue[42] have recently entered agreements prohibiting them from making some of the same misrepresentations described in this Complaint in New York.

186. Moreover, at all times relevant to this Complaint, the Manufacturer Defendants fraudulently concealed their deceptive marketing and unlawful, unfair, and fraudulent conduct. For example, the Manufacturer Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and organizations and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

187. The Manufacturer Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. The Manufacturer Defendants exerted considerable influence on these promotional and "educational"

[42] Not a Defendant herein.

materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Janssen, ran similar websites that masked their own direct role.

188. Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by the Municipal Plaintiffs.

189. Thus, the Manufacturer Defendants successfully concealed from the medical community, patients, and health care payors facts sufficient to arouse suspicion of the claims that Plaintiffs now assert. Plaintiffs did not know of the existence or scope of the Manufacturer Defendants' industry-wide fraud and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

### G. By Knowingly Causing an Explosion in Opioid Prescriptions, Use, Misuse, Abuse, and Addiction Through Their Deceptive Marketing Schemes and Unlawful and Unfair Business Practices, Each Manufacturer Defendant Has Created or Assisted in the Creation of a Public Nuisance in the Towns

#### 1. The Manufacturer Defendants' Deceptive Marketing Scheme Has Caused and Continues to Cause a Huge Increase in Opioid Prescriptions and Use in the Towns

190. The Manufacturer Defendants' misrepresentations deceived and continue to deceive doctors and patients in the Towns about the risks and benefits of long-term opioid use. Studies also reveal that some doctors and many patients are not aware of or do not understand

these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive. No doubt, Maryland residents in treatment for opioid addiction, including residents of the Towns, were never told that they might become addicted to opioids when they started taking them, were told that they could easily stop using opioids, or were told that the opioids they were prescribed were less addictive than other opioids.

191. The Manufacturer Defendants knew and should have known that their misrepresentations about the risks and benefits of long-term opioid use were false and misleading when they made them.

192. The Manufacturer Defendants' deceptive marketing scheme and their unlawful and unfair business practices caused and continue to cause doctors and other clinicians in the Towns to prescribe opioids for the long-term treatment of chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia. Absent the Manufacturer Defendants' deceptive marketing scheme and their unlawful and unfair business practices, these doctors would not have prescribed as many opioids to as many patients, and there would not have been as many opioids available for misuse and abuse or as much demand for those opioids.

193. The Manufacturer Defendants' deceptive marketing scheme and their unlawful and unfair business practices also caused and continue to cause patients in Maryland, including patients in the Towns, to purchase and use opioids for their chronic pain believing they are safe and effective. Absent Defendants' deceptive marketing scheme, fewer patients would be using opioids long-term to treat chronic pain, and those patients using opioids would be using less of them. The Manufacturer Defendants' deceptive marketing and their unlawful and unfair business practices

have caused and continue to cause the prescribing and use of opioids to explode in the Towns or by user residents and visitors to the Towns.

194. The Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids during the past few years has been particularly effective, including in the Towns. For example, one survey reports that pain specialists were more likely to recognize that OxyContin had abuse-deterrent properties and to prescribe OxyContin specifically because of those properties. Further, prescribers who knew of OxyContin's abuse-deterrent properties were using more of it than those who did not know it was an AD opioid. Although sales of AD opioids still represent only a small fraction of opioids sold (less than 5% of all opioids sold in 2015), they represent a disproportionate share of opioid sales revenue ($2.4 billion or approximately 25% in opioid sales revenue in 2015).

195. The dramatic increase in opioid prescriptions and use corresponds with the dramatic increase in the Manufacturer Defendants' spending on their deceptive marketing scheme. The Manufacturer Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011, that spending had tripled to $288 million.

**2. By Causing an Explosion in Opioid Prescriptions and Use, the Manufacturer Defendants Have Created or Assisted in the Creation of a Public Nuisance in the Towns**

196. The escalating number of opioid prescriptions written by doctors who were deceived by the Manufacturer Defendants' deceptive marketing scheme is the cause of a correspondingly dramatic increase in opioid addiction, overdose, and death throughout the U.S. and Maryland, including in the Towns.

197. Representing the regulators in hearings before the Senate Caucus on International Narcotics Control in May 2014, Dr. Nora Volkow explained that "aggressive marketing by

pharmaceutical companies" is "likely to have contributed to the severity of the current prescription drug abuse problem."

198. In August 2016, the Surgeon General published an open letter to be sent to physicians nationwide, enlisting their help in combating this "urgent health crisis" and linking that crisis to deceptive marketing. He wrote that the push to aggressively treat pain, and the "devastating" results that followed, had "coincided with heavy marketing to doctors . . . . [m]any of [whom] were even taught—incorrectly—that opioids are not addictive when prescribed for legitimate pain."

199. Scientific evidence demonstrates a strong correlation between opioid prescriptions and opioid abuse. In a 2016 report, one regulator explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving prescription opioids for chronic pain account for the majority of overdoses. For these reasons, regulators have concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."

200. Contrary to the Manufacturer Defendants' misrepresentations, most opioid addiction begins with legitimately prescribed opioids. In 2011, 71% of people who abused prescription opioids got them through friends or relatives, not from pill mills, drug dealers or the internet. Numerous doctors and substance abuse counselors note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic. As regulators observed in 2016, the opioid epidemic is getting worse, not better.

201. The Manufacturer Defendants' creation, through false and misleading advertising and other unlawful and unfair conduct, of a virtually limitless opioid market has significantly harmed the Towns. The Manufacturer Defendants' success in extending the market for opioids to new patients and chronic pain conditions has created an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

202. The rise in opioid addiction caused by the Manufacturer Defendants' deceptive marketing scheme has also resulted in an explosion in heroin use. Almost 80% of those who used heroin in the past year previously abused prescription opioids.

203. Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families. Some will get treatment and fewer will successfully complete it; many of those patients will relapse, returning to opioids or some other drug. Of those who continue to take opioids, some will overdose—some fatally, some not. Others will die prematurely from related causes—falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

204. Absent each Manufacturer Defendants' deceptive marketing scheme and their unlawful and unfair business practices, the public health crisis caused by opioid misuse, abuse, and addiction in the Towns, would have been averted or much less severe.

205. These harms in the Towns, caused by the Manufacturer Defendants' deceptive marketing schemes and unlawful and unfair business practices are a public nuisance because they significantly interfere with the public health, safety, peace, comfort, and convenience, are

substantial and unreasonable, and has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.

### 3. The Manufacturer Defendants Knew and Should Have Known That Their Deceptive Marketing Schemes Would Create or Assist in the Creation of This Public Nuisance in the Towns

206. The Manufacturer Defendants knew and should have known about these harms that their deceptive marketing and unlawful and unfair business practices have caused and continue to cause in the Towns. The Manufacturer Defendants closely monitored their sales and the habits of prescribing doctors. Their sales representatives, who visited doctors and attended CMEs, knew which doctors were receiving their messages and how they were responding. The Manufacturer Defendants also had access to, and watched carefully, government and other data that tracked the explosive rise in opioid use, addiction, injury, and death. They knew—and, indeed, intended—that their misrepresentations would persuade doctors in or near the Towns to prescribe, and patients in the Towns to use, their opioids for chronic pain.

### 4. The Manufacturer Defendants' Conduct and Role in Creating or Assisting in the Creation of the Public Nuisance Is Not Excused by the Actions of any Third Parties

207. The Manufacturer Defendants' actions are not permitted nor excused by the fact that their drug labels may have allowed or did not exclude the use of opioids for chronic pain. Regulatory approval of opioids for certain uses did not give the Manufacturer Defendants license to misrepresent the risks and benefits of opioids. Indeed, the Manufacturer Defendants' misrepresentations were directly contrary to pronouncements by and guidance from regulators based on the medical evidence and their own labels.

208. Likewise, the Manufacturer Defendants' causal role was not broken by the involvement of doctors and other prescribing clinicians who prescribed opioids to their patients in reasonable reliance upon the Manufacturer Defendants' misrepresentations. Defendants'

marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. The Manufacturer Defendants were also able to harness and hijack what doctors and other prescribing clinicians wanted to believe—namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

### H. The Manufacturer Defendants' Fraudulent Marketing Has Led To Record Profits

209. While the use of opioids has taken an enormous toll on the Towns and its citizens, the Manufacturer Defendants have realized blockbuster profits. In 2014 alone, opioids generated $11 billion in revenue for drug companies like the Manufacturer Defendants. Indeed, financial information indicates that each Manufacturer Defendant experienced a material increase in sales, revenue, and profits from the false and misleading advertising and other unlawful and unfair conduct described above.

### I. John Kapoor and Michael Babich Led Insys's Misconduct

210. John Kapoor ("Kapoor"), the founder and majority owner of Insys, and Michael Babich ("Babich"), the former CEO and President of Insys, led a nationwide conspiracy to profit using bribes and fraud to cause the illegal distribution of Subsys.

211. Kapoor and Babich conspired to bribe practitioners in various states, including in Maryland, many of whom operated pain clinics, in order to get them to prescribe Subsys. In exchange for bribes and kickbacks, the practitioners wrote large numbers of prescriptions for patients, many of whom were not diagnosed with cancer, and therefore did not need Subsys.

212. Kapoor and Babich also conspired to mislead and defraud health insurance providers who were reluctant to approve payment for the drug when it was prescribed for non-

cancer patients. They achieved this goal by setting up a "reimbursement unit" which was dedicated to obtaining prior authorization directly from insurers and pharmacy benefit managers.

213. Kapoor and Babich fueled the opioid epidemic by paying doctors to needlessly prescribe Subsys for patients who did not need it, and without complying with Maryland law, thus putting patients at risk and contributing to the current opioid crisis. Kapoor and Babich committed fraud, placing profit before patient safety, to sell a highly potent and addictive opioid.

### J. Distributor Defendants' Violation of Duty

214. Distributor Defendants have a duty to exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another is under a duty to exercise reasonable care to prevent the threatened harm.

215. Specifically, under the Code of Maryland Regulations 10.19.03.03, manufacturers, distributors, and dispensers are required to monitor and report suspicious orders of "controlled dangerous substances" and register with the Maryland Department of Health. Each of the Manufacturer and Distributor Defendants are obligated to monitor and report suspicious orders of controlled substances, especially opioids. Additionally, pursuant to the Code of Maryland Regulations ("COMAR") Regulation10.19.03.12, all such "registrants" are required to "guard against theft and unlawful diversion of controlled substances" and importing the security requirements set forth.

### K. Distributor Defendants Knew or Should Have Known They Were Facilitating Widespread Opioid Diversion

216. Opioid diversion in the supply chain has always been a widespread problem and has been highly publicized. Numerous publications from regulators, and professional health

associations have highlighted the epidemic rate of opioid abuse and overdose rates in the Towns, as well as throughout the United States.

217. Prescription drug abuse is one of the fastest-growing drug problems in the United States, and particularly in Maryland.

218. To combat the problem of opioid diversion, regulators have provided guidance to distributors on the requirements of suspicious order reporting in numerous venues, publications, documents, and final agency actions.

219. Since 2006, regulators have conducted one-on-one briefings with distributors regarding downstream customer sales, their due diligence responsibilities, and their legal and regulatory responsibilities (including the responsibility to know their customers and report suspicious orders). The distributors were provided with data on controlled substance distribution patterns and trends, including data on the volume of orders, frequency of orders, and percentage of controlled vs. non-controlled purchases. The distributors were also given case studies, legal findings against other registrants, and profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. These materials pointed out "red flags" distributors should look for in order to identify potential diversion. This initiative was created to help distributors understand their duties with respect to diversion control.

220. For years, regulators have hosted conferences to provide distributors with updated information about diversion trends and regulatory changes that affect the drug supply chain, the distributor initiative, and suspicious order reporting. All of the major distributors – including AmerisourceBergen and Cardinal Health—attended at least one of these conferences. The conferences allowed the distributors to ask questions, raise concerns, and request clarification on policies and procedures intended to prevent opioid diversion.

221. Likewise, regulators have participated in numerous meetings and events with the legacy Healthcare Distribution Management Association ("HDMA"), now known as the Healthcare Distribution Alliance ("HDA"), an industry trade association for wholesalers and distributors. Regulators have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances.[43] (HDMA, "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," (2008).)

222. On September 27, 2006 and again on December 27, 2007, regulators sent letters to all relevant opioid distributors providing guidance on suspicious order monitoring of controlled substances and the responsibilities and obligations of the registrant to conduct due diligence on controlled substance customers as part of a program to maintain effective controls against diversion. These letters reminded these distributors that they were required by law to exercise due diligence to avoid filling orders that may be diverted into the illicit market. These letters explained that as part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of all orders prior to filling.

223. In late 2007, regulators sent a follow-up letter to all relevant opioid distributors providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The letter reminded these distributors that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the

---

[43] *See, e.g.*, HDA.org, Issues in Distribution, *Prescription Drug Abuse and Diversion* (2018) (describing various resources "address[ing] the industry's approach to countering diversion and ensuring the safe supply of medicines to licensed entities across the supply chain"), https://www.hda.org/issues/prescription-drug-abuse-and-diversion.

regulatory criteria for suspicious order reporting. The letter also advised distributors that they must perform an independent analysis of a suspicious order prior to the sale to determine if controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the distributors from legal responsibility.

224. The Distributor Defendants were on notice that their own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" that stressed the critical role of each member of the supply chain in distributing controlled substances.

225. Opioid distributors themselves recognized the magnitude of the problem and, at least rhetorically, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

226. For example, a Cardinal Health executive recently claimed that it uses "advanced analytics" to monitor its supply chain; Cardinal Health assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

227. These assurances, in addition to obligations imposed by law, show that Distributor Defendants understand and have undertaken a duty to protect the public against diversion from their supply chains, and to curb the opioid epidemic.

228. However, despite these statements and duties, Distributor Defendants have knowingly or negligently allowed diversion. Their misconduct has resulted in numerous civil fines and other penalties recovered by state and federal agencies, including actions by regulators.

229. In 2008, Cardinal Health paid a $34 million penalty to settle allegations about opioid diversion taking place at seven warehouses around the United States. Again, in 2012,

Cardinal Health reached an administrative settlement to resolve allegations of opioid diversion between 2009 and 2012 in multiple states. More recently, in December 2016, Cardinal Health settled similar allegations of opioid diversion, paying $34 million plus penalties. During the investigation of Cardinal Health, evidence was discovered that Cardinal Health's own investigator warned Cardinal Health against selling opioids to a particular pharmacy in Florida that was suspected of opioid diversion. Instead of heeding their investigator's warning, Cardinal Health increased its shipments to this pharmacy by almost 2 million doses of oxycodone in just one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

230. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies. Again in 2012, AmerisourceBergen was implicated for failing to protect against the diversion of particular controlled substances into non-medically necessary channels. It has been reported that AmerisourceBergen has been subpoenaed for documents in connection with a grand jury proceeding seeking information on the company's "program for controlling and monitoring diversion of controlled substances into channels other than for legitimate medical, scientific and industrial purposes."

231. Although these Distributor Defendants have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry which generates billions of dollars in revenue.

232. Plaintiffs do not bring causes of action based on violations of federal statutes and regulations. However, the existence of these complicated regulatory schemes shows Defendants' intimate knowledge of the dangers of diversion of prescription opioids and the existence of a thriving illicit market for these drugs. The Defendants breached their duties to Plaintiffs despite

this knowledge and longstanding regulatory guidance of how to deter and prevent diversion of prescription opioids.

### L. The Pharmacy Defendants Understood But Violated Their Duties

233. Pharmacy Defendants CVS, Rite Aid, Prince George's Hospital, Southern Maryland Hospital, Kaiser, Doctor's Hospital, Pharmerica, Accokeek Drug, Giant Food, and Safeway earned enormous profits by flooding the State of Maryland, including the Towns, with prescription opioids. They gained unique knowledge of the oversupply of prescription opioids through the extensive data and information they developed and maintained as both distributors and dispensaries. Rather than act to stem the flow of opioids into communities like the Towns, they participated in and profited from the oversupply. Further, on information and belief, each of the Pharmacy Defendants is a top dispenser of opioids to the Towns' patients and has committed and continues to commit serious and flagrant violations of their duties under Maryland law regarding—*inter alia*—recordkeeping and dispensing opioids to the Towns' patients. (*See, e.g.*, COMAR Reg. 10.19.03.03 [requiring manufacturers, distributors, and dispensers of "controlled dangerous substances" including Manufacturing Defendants' prescription opioids to register with the Maryland Department of Health]; COMAR Reg. 10.19.03.12 [requiring all such registrants to "guard against theft and unlawful diversion of controlled substances" and observe other security requirements].)

### M. Each of the Defendant's Misconduct Has Injured and Continues to Injure the Towns and Their Citizens

234. In addition to the significant social costs associated with illicit drug use, Defendants' predatory and willful misrepresentations in manufacturing, marketing and/or distributing opioids have imposed enormous tax-based economic damages on the Towns, including tax revenue expended for various public services the Towns are required to provide to

their citizens under Maryland law. These services include healthcare, social, environmental and crime-related costs, as well as for special programs and services aimed at addressing and combating the Towns' opioid crisis on its own accord. These revenues would not have been expended but for the opioid crisis that Defendants willfully and foreseeably caused in Maryland generally and the Towns specifically.

235. In response to the opioid overdose epidemic, the County Health Department implemented various community outreach and education programs intended to address the opioid epidemic in the region, including in the Towns. Among these efforts, the County started an Overdose Prevention Plan with a planning group comprised of public safety entities, mental health authorities, and medical, administrative, and pharmacy leaders from private and public institutions serving greater Prince George's County, which includes the Towns.[44] The purpose of the Overdose Prevention Plan is to address the opioid overdose epidemic as well as other drug related issues. Part of the Overdose Prevention Plan includes providing training to individuals on the use of a "Naloxone kit" which consists of, among other things, intranasal naloxone doses and information cards summarizing overdose revival steps.

236. As part of the ongoing efforts to mitigate opioid addiction related deaths, Prince George's County's first responders, including municipal first responders within the Towns, are required to carry naloxone, the drug that can reverse an opioid overdose. In 2016, first responders

---

[44] Prince George County Health Department Overdose Prevention Plan, April 2018, https://beforeitstoolate.maryland.gov/wp-content/uploads/sites/34/2018/09/Approved-for-public-sharing-Prince-George_s-County-FY2019-Response-Plan-with-Contacts.pdf.

in the Prince George's County region administered 712 doses to people who had overdosed.[45] In 2017, the County administered 951 doses.[46]

237. Despite the efforts of Prince George's County, including those of the Towns, from 2012 to 2016, the number of overdose related deaths increased. The number of overdose deaths in Prince George's County increased from 56 in 2012 to 129 in 2016.

238. Prince George's County and municipal officials, and those specifically in the Towns have taken significant efforts to educate their residents regarding the danger of opioid drugs. Among other things, the County led and initiated an overdose response training program to provide residents, including those specifically residing in the Towns, training on how to administer naloxone to an individual experiencing an overdose and to provide potentially life-saving information regarding overdose treatment. In addition, the County conducts informational symposiums regarding the opioid epidemic to provide information regarding contributing factors to the opioid epidemic and share the importance of community involvement to address the crisis.

239. As Defendants' opioids continue to wreak havoc on the Towns and incapacitate and/or kill their citizens, the Towns have also been deprived of the benefits these citizens would have conferred to the community but for Defendants' wrongful conduct. The Towns have lost both the productivity of its citizens who have been hospitalized, incarcerated, killed, or otherwise incapacitated by Defendants' dangerous products, including the property and/or sales taxes these citizens would have paid had Defendants simply told the truth about the risks and benefits of opioids.

---

[45] Prince George's County Health Department 2017 Opioid Overdose Report, http://www.pgchealthzone.org/content/sites/pgchd/2017_OD_Report_suppressed.pdf.

[46] *Id.*

**1. Tax Revenue Expended—Healthcare-Related Costs**

240. While Defendants reaped billions of dollars in profits from their deceptive conduct, the Towns have suffered—and continue to suffer—irreparable damage in the form of increased healthcare-related costs, which Maryland law requires that the Towns pay to protect the health, welfare and safety of its citizenry. The Towns would not have incurred these costs had Defendants not concealed the dangers (and misrepresented the benefits) of the relevant opioids.

241. In particular, each of the Defendants has directly and proximately caused the Towns to expend resources for services relating to the serious health crisis created by the opioid crisis that might otherwise fund other important health-care needs.

242. In 2017, Maryland had the nation's highest rate of hospitalizations for opioid use, according to federal data that illustrates the depth of the addiction problem in a state where many people have died from overdoses of the drugs.[47] Between 2010 and 2015, there were approximately 2,531.1 inpatient stays resulting from opioid use per 100,000 people compared to the 1,304.9 figure reflecting opioid-related inpatient stays across the United States.[48] It is clear that opioids have a significant impact upon Maryland's medical care system due to the volume of encounters involving opioids, and the costs of these encounters. While the full economic burden of opioids upon the healthcare system is difficult to precisely calculate, a reasonable measure may be derived using emergency department visits and charges provided by the Maryland Department of Health and Mental Hygiene. In 2014, there were 1,564 heroin-related emergency department

---

[47] Cohn, Meredith, The Baltimore Sun, *Opioid users filling Maryland hospital beds and emergency rooms* (Jan. 6, 2017), https://www.baltimoresun.com/health/bs-hs-opioid-hospitalizations-20170106-story.html

[48] amfAR, Opioid & Health Indicators Database, *Maryland Opioid Epidemic*, https://opioid.amfar.org/MD

visits in Maryland.[49] Using this approach, the cost of 1,564 heroin-related emergency department visits totaled $1.55 million dollars.[50] Thus, in 2014, the average cost per heroin-related emergency department visit in Maryland amounted to approximately $991. In 2014, there were 1,101 prescription opioid-related emergency department visits in Maryland.[51] Using this approach, the cost of 1,101 prescription opioid-related emergency department visits totaled $1.5 million dollars.[52] Thus, in 2014, the average cost per prescription opioid-related emergency department visit in Maryland amounted to approximately $1,362.

243. On information and belief, the incidence of opioid-related hospitalizations emanating from the Towns—which can be tracked by various medical billing and documentation codes, such as the Healthcare Common Procedure Coding System ("HCPCS") and the American Medical Association's Current Procedural Terminology (CPT), including National Drug Codes (NDCs) and International Classification of Diseases ("ICD") codes—increased during the relevant period.

244. As the number of opioid-related hospital encounters from the Towns' residents have increased, so too has the cost of treatment and supplies. This increase has strained—and continues to strain—the Municipal Plaintiffs' General and Special Revenue Funds, which provide necessary funding to respond appropriately to an increasingly large demand for opioid-related emergency medical and related services.

---

[49] Maryland Department of Health and Mental Hygiene, *Data Report, Drug and Alcohol-Related Emergency Department Visits in Maryland 2008-2014* (Sep. 2015), p. 39, https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Documents/Drug%20and%20Alcohol-related%20ED%20Visits_2008-2014.pdf.

[50] *Id.*, at p. 43.

[51] *Id.*, at p. 46.

[52] *Id.*, at p. 50.

245. At the same time, the costs of providing 911 dispatch, fire services, emergency medical and first responder services, and other 911 services for opioid emergencies have likewise increased. Additionally, the Towns regularly work with first responders to address burn out and compassion fatigue associated with the opioid epidemic by providing educational seminars, outreach, training on the importance of self-care, and hosting appreciation dinners where first responders are reunited with former opioid addicts that are now in recovery.

246. Defendants' actions that fueled the opioid crisis have also devastated many families and individuals across the country, including those residing or working in the Towns. In response, Plaintiffs have provided, and continue to provide, a variety of services and programs to help protect the health, safety, and welfare of their children, families, and individuals affected by the opioid epidemic which has caused the Municipal Plaintiffs to expend significant resources on programs and services such as recovery support services, mental health services, integrated health care services for low-income residents, and free opioid overdose rescue training with naloxone.

**2. Tax Revenue Expended—Crime-Related Costs**

247. In addition to imposing on Plaintiffs increasing healthcare-related costs, Defendants' scheme has increased the Towns' crime-related costs and diminished the quality of life, including those costs associated with opioid-related arrests, investigations, and other criminal justice programs. Funding for these programs impose on the Towns costs that could otherwise serve other significant public safety needs.

248. The effects of Defendants' deceptive marketing and distribution scheme has further impacted Plaintiffs by creating various public nuisances—including public health and safety hazards—which Plaintiffs are obligated to abate. Plaintiffs have dedicated tax dollars to alleviate hunger, blight and maintain the public safety of places, such as community parks, schools and

public lands, where patients-turned-addicts may congregate as well as mitigating the increase in drug and property-related crimes committed by opioid addicts who are both actively looking to feed their addictions, as well as suffering from serious medical conditions associated with the spread of opioid abuse, such as Hepatitis B and C, HIV, sexually transmitted diseases and methicillin-resistant staphylococcus aureus ("MRSA"), among other conditions. Plaintiffs have budgeted for and hired code enforcement officers to enforce local ordinances and maintain community standards and property values to counter the adverse effects of neighborhood blight that is an indirect byproduct of the opioid crises. The Town of Cottage City has recently partnered with a local church in Town to provide a food bank to serve local residents and families including those adversely affected by the opioid crises.

249. The Towns' police departments have expended resources and exerted significant efforts to respond to opioid-related calls and crimes. The number of calls and criminal activities related to the abuse of or potential opioid overdoses and/or complications have materially increased in the relevant time frame. In particular, the Town of Forest Heights Police Department installed and operates a network of community safety cameras strategically located to monitor public areas throughout the Town to interdict illegal drug and other illicit traffic from entering and leaving the Town's residential neighborhoods. Furthermore, in an effort to render first aid and utilize non-lethal force particularly on victims of the opioid crisis, the Towns' police departments have purchased, trained and equipped their officers to use tasers and other non-lethal means of force and purchased and trained their municipal uniformed and civilian staffs to operate Automated External Defibrillators ("AED's") and administer Narcan®.

250. In abating the opioid nuisance to protect the health and safety of citizens of the Towns Plaintiffs have suffered pecuniary damages, proximately caused by Defendants' misrepresentations and omissions of material fact.

### 3. Other Costs Incurred by the Municipal Plaintiffs

251. As the Defendants' misconduct continues to frustrate efforts to protect the health and safety of the citizens of the Towns, the County continues to allocate substantial sums to directly finance the operation of its Circuit Courts and Juvenile Courts that also play a role in the Towns' interactions with and support to the courts and overall response to the opioid epidemic. Specifically, Prince George's County provides a County Circuit Court Adult Drug Court.[53] The goal is to divert non-violent substance abuse offenders who might otherwise face incarceration to a supervised, sanction-based treatment program that attempts to reduce recidivism and drug use and assist individuals to become self-supporting. The program requires participants to attend regular hearings before a Presiding Judge, maintain a daily curfew, and participate in mandatory substance abuse treatment and undergo frequent drug testing.

252. Further, the Towns participate in the County's Overdose Education and Naloxone Distribution program. Staff in the methadone maintenance program collaborate with the local police department to divert opioid users to treatment rather than incarceration and provides training to individuals regarding treatment of suspected overdose by administering naloxone.

### 4. Tax Revenue Forgone

253. Tax revenue forgone is a consequence of incapacitation. The principal events associated with incapacitation include specialty treatment admission, hospitalization, and death. As a result of such incapacitation, the citizens of the Towns who are addicted to Defendants'

[53] https://princegeorgescourts.org/350/Adult-Drug-Court.

opioids are unable to work or contribute to the Towns' financial health through sales, property, and other taxes.

254. The lost tax revenue attributable to these patients is especially significant for the Municipal Plaintiffs, as the vast majority of such patients would—but for their addiction—be productive members of the affected communities.

255. The opioid epidemic and public nuisance that resulted from Defendants' deceptive strategy continues to frustrate the Municipal Plaintiffs' ability to recover from the crisis.

**(a) Specialty Treatment**

256. According to a 2016 Opioid Treatment Programs in Maryland Needs Assessment Report prepared by the University of Maryland Baltimore Systems Evaluation Center for the Maryland Behavioral Health Administration, between approximately 48,198 and 76,458 Marylanders age 12 or older are in need of treatment for a problem with opioid use.[54] The Towns's residents are no exception. Drug overdose and, in particular, opiate overdose has been a concerning, ongoing trend. The misuse of illicit and prescription narcotics is evidenced by an increase in treatment admissions in Prince George's County as well as fatal and non-fatal overdoses. As a result, residents in the Towns that have become incapacitated by their addictions cannot meaningfully contribute to society because they are in treatment for the misuse/abuse of opioids. The lost tax revenue attributable to these patients is especially significant for the Municipal Plaintiffs, as the vast majority of such patients would—but for their addiction—be productive and taxpaying members of these communities.

---

[54] University of Maryland Baltimore Systems Evaluation Center, *Opioid Treatment Programs in Maryland Needs Assessment Report* (Sep. 2016), page 3, https://bha.health.maryland.gov/Documents/Combined%20OTP%20Needs%20Assessment%20Report%20and%20letter11.18.16.pdf




257. Despite the fact that the Towns and the County have successfully initiated and continue to provide treatment and other resources to its citizens, the opioid epidemic and public nuisances that have resulted from Defendants' acts continue to frustrate the communities' ability to recover from the crisis.

**(b) Hospitalization**

258. Patients who are hospitalized in connection with opioid-related emergencies are likewise unable to contribute to the Towns' financial health with their labor or through the payment of taxes. From 2008 to 2014, Maryland emergency department visits for heroin- or prescription opioid-related emergencies increased by over 227% and continues to be on the rise.[55] Moreover, government estimates indicate that opioid-related hospital stays are consistently longer than those attributable to both hallucinogens and stimulants, including cocaine and methamphetamine.[56] Longer hospital stays are usually more expensive and lead to larger losses of productivity for the hospitalized patient.

[55] Maryland Department of Health and Mental Hygiene, *Data Report, Drug and Alcohol-Related Emergency Department Visits in Maryland 2008-2014* (Sep. 2015), https://bha.health.maryland.gov/OVERDOSE_PREVENTION/Documents/Drug%20and%20Alcohol-related%20ED%20Visits_2008-2014.pdf.

[56] Laura Radel, *Substance Use, the Opioid Epidemic, and the Child Welfare System: Key Findings from a Mixed Methods Study*, U.S. Dept. of Health and Human Services, p. 4 (Mar. 7, 2018), https://aspe.hhs.gov/system/files/pdf/258836/SubstanceUseChildWelfareOverview.pdf.

**(c) Death**

259. According to government estimates, some 50,000 Americans died from an opioid overdose in 2016—*i.e.*, 137 people per day, and roughly one person every 12 minutes. [57] The emotional devastation caused by Defendants' despicable actions is impossible to quantify; however, as described above, the purely economic consequences of the opioid epidemic can and have been successfully tracked in terms of lives, lost productivity, healthcare, criminal justice and other costs. Accordingly, in 2017, President Donald Trump's Council of Economic Advisers estimated that the economic consequences to the nation of the opioid drug epidemic cost the United States $504 billion in 2015 alone, prompting the President to declare the opioid crisis a nationwide public health emergency.

260. Plaintiffs have been hit even harder by the opioid crisis. From 2007 to 2018, approximately 12,087 Marylanders died from opioid-related intoxication causes.[58] During that same period, approximately 395 citizens in Prince George's County, including citizens of the Plaintiff-Towns, died from opioid-related intoxication causes, who would not have died but for the Defendants' misconduct as described in this Complaint.[59]

---

[57] Money.com, *Here's What I Would Cost to Fix the Opioid Crisis, According to 5 Experts* (Nov. 27, 2017), http://money.com/money/5032445/cost-fix-opioid-crisis/.

[58] Maryland Department of Health data report, Table 6. Number of Opioid-Related Intoxication Deaths by Place of Occurrence, Maryland, 2007-2017; Opioid Operational Command Center ("OOCC") data report, Table 1. Comparison of Unintentional Opioid-Related Intoxication Deaths by Place of Occurrence, Maryland, 2017 and 2018.

[59] Maryland Department of Health data report, Table 6. Number of Opioid-Related Intoxication Deaths by Place of Occurrence, Maryland, 2007-2017; Opioid Operational Command Center ("OOCC") data report, Table 1. Comparison of Unintentional Opioid-Related Intoxication Deaths by Place of Occurrence, Maryland, 2017 and 2018.

**WAIVER OF CERTAIN CLAIMS FOR RELIEF**

261. The Municipal Plaintiffs expressly disclaim and waive any and all right to recovery, whether financial, injunctive, or equitable, relating to or arising out of the distribution by any person of any product, or the provision of any service, pursuant to McKesson Corporation's ("McKesson") Pharmaceutical Prime Vendor Contract ("PPV Contract") with the United States Department of Veteran Affairs. Specifically, the Municipal Plaintiffs expressly disclaim and waive any and all right to recover against any of the Distributor or Pharmacy Defendants under the terms and conditions of any PPV Contract or any similar contract.

262. The Municipal Plaintiffs further commit that they will not, in any forum, rely on or raise the PPV Contract in connection with their allegations and/or prosecution in this matter.

263. The Municipal Plaintiffs agree that should Defendants present evidence sufficient for the trier of fact to determine that the Municipal Plaintiffs' injuries were caused, in whole or in part, by the distribution of products or provision of services through the PPV, Defendants are entitled to a reduction of their liability proportionately by the extent to which the trier of fact determines that any injury to the Municipal Plaintiffs was caused by goods or products distributed and/or services provided through the PPV.

## V. CAUSES OF ACTION

**COUNT I**

**Public Nuisance**
**(Against All Defendants)**

264. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

265. Defendants, individually and in concert with each other, have contributed to, and/or assisted in creating and maintaining a condition that is a significant interference with the public health, the public safety, the public peace, the public comfort, and the public convenience.

266. The public nuisance created by Defendants' actions is substantial and unreasonable—it has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit.

267. This injury to the public includes, but is not limited to (a) widespread dissemination of false and misleading information regarding the risks, benefits, superiority, and appropriateness of opioids to treat chronic pain; (b) distortion of the medical standard of care for treating chronic pain, resulting in pervasive overprescribing of opioids and the failure to provide more appropriate pain treatment; (c) high rates of opioid abuse, injury, overdose, and death, and their impact on families and communities in the Towns; (d) increased healthcare costs for individuals, families, employers, and the Towns; (e) lost employee productivity resulting from the cumulative effects of long-term opioid use, addiction, and death; (f) the creation and maintenance of a secondary, illicit market for opioids; and (g) greater demand for emergency services and law enforcement paid for by the Towns at the ultimate cost of taxpayers.

268. Defendants knew or should have known that their promotion of opioid use would create a public nuisance.

269. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used. Absent Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

270. The health and safety of the Municipal Plaintiffs' residents, including those who used, have used, or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern to the Towns and the entire state.

271. Defendants' conduct has injuriously affected, and continues to affect, property in the Towns, patrons, employees, and a considerable number of people within the Towns, and across the state.

272. Defendants' conduct also constitutes a nuisance *per se* because it independently violates other applicable statutes. As set forth below, the Manufacturing Defendants have violated the Maryland Consumer Protection Act and the Maryland False Claims Statute.

273. As alleged herein, Defendants acted with actual malice, constituting conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud, entitling the Municipal Plaintiffs to an award of punitive damages.

WHEREFORE, the Municipal Plaintiffs demand judgment against all Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, plus interest, fees and costs, and for any other relief that is just and proper.

## COUNT II

### Negligence
### (Against All Defendants)

274. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

275. Each Defendant owed a duty of care to Plaintiffs, including but not limited to, taking reasonable steps to prevent the misuse, abuse, and over-prescription of opioids.

276. In violation of this duty, Defendants, and each of them, failed to take reasonable steps to prevent the misuse, abuse, and over-prescription of opioids by misrepresenting the risks and benefits associated with opioids and by distributing and prescribing dangerous quantities of opioids.

277. Each of the Manufacturing Defendants owed the Towns a duty to promote and market opioids truthfully and to disclose the true risk of addiction associated with the risk of opioids. Each of the Manufacturing Defendants breached those duties by, among other things, circulating false and misleading information concerning the risks and benefits of opioids and downplaying or omitting the risks of addiction arising from their use. As set forth above in this Complaint, the Manufacturer Defendants' misrepresentations include falsely claiming that the risk of opioid addiction was negligible, falsely instructing doctors and patients that describing more opioids was appropriate when patients presented symptoms of addiction, falsely claiming that risk-mitigation strategies were so efficacious as to virtually negate concerns about addiction, falsely claiming that doctors and patients could increase opioid doses without significant added risk, and falsely claiming that long-term opioid use could actually restore function and improve a patient's quality of life without posing significant additional risks. Each of these misrepresentations made by Defendants violated their duty of care to the Towns.

278. Each of the Manufacturing Defendants and Distributor Defendants also owed the duties to report suspicious sales; to not fill suspicious orders; to abide by any government agreements entered into regarding the same and to comply with state regulations. (*See, e.g.*, COMAR 10.19.03.12.) Each of the Manufacturing Defendants and Distributor Defendants breached these duties by failing to design and operate a system that would disclose the existence

of suspicious orders of controlled substances or by failing to report such suspicious orders to the appropriate regulators.

279. The Distributor Defendants knew of the serious problem posed by prescription opioid diversion and were under a legal obligation to take reasonable steps to prevent diversion.

280. The Distributor Defendants negligently distributed suspiciously large quantities of potent opioids and failed to report such distributions. As such, the Distributor Defendants violated their duty of care by moving these dangerous products into the Towns in such quantities, facilitating misuse and abuse of opioids.

281. Plaintiffs are not asserting a cause of action under the federal Controlled Substances Act or any other federal controlled substances laws, including—but not limited to—the federal laws cited above.

282. Defendants are liable for negligence *per se* in that the Defendants violated applicable Maryland laws, statutes, and regulations, in the manner in which they advertised, marketed, sold, and/or distributed opioid products. Plaintiffs are members of the class meant to be protected by the laws, statutes, and regulations which Defendants violated, and Plaintiffs' injuries were caused by the violations.

283. As a direct and proximate cause of Defendants' unreasonable and negligent conduct, the Towns have suffered and will continue to suffer harm, and are entitled to damages in an amount to be determined at trial. Indeed, the Towns suffered both injuries and pecuniary losses proximately caused by the Defendants' breaches. Among other things, the Towns have experienced an unprecedented opioid addiction and overdose epidemic costing millions in health insurance, government services, emergency visits, treatment for related illnesses and accidents, payments for fraudulent prescriptions, and lost productivity to their workforce.

284. Plaintiffs' damages were caused solely by the negligence of the Defendants without any negligence by the Towns.

285. As alleged herein, Defendants acted with actual malice, constituting conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud, entitling the Towns to an award of punitive damages.

WHEREFORE, the Municipal Plaintiffs demand judgment against all Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, plus interest, fees, and costs, and for any other relief that is just and proper.

## COUNT III

### Negligent Misrepresentation
### (Against the Manufacturer Defendants)

286. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

287. Defendants, individually and acting through their employees and agents, and jointly and severally, made misrepresentations and omissions of facts material to Plaintiffs and its residents to induce them to purchase, administer, and consume opioids as set forth in detail herein.

288. Defendants had a duty to exercise reasonable care in marketing and selling highly dangerous opioid drugs.

289. Defendants negligently asserted false statements and omitted material facts regarding the benefits of and evidence for the use of opioids for chronic pain as set forth herein, while understating their very serious risks, including the risk of addiction.

290. Defendants intended that the Towns and their residents and /or employees or others affecting the Towns or spending time therein would rely on their misrepresentations and

omissions, knew that the Towns and its residents would rely on their misrepresentations, and that such reliance would cause the Towns to suffer loss.

291. Healthcare providers and residents in the Towns reasonably relied on Defendants' misrepresentations and omissions in writing, filling, and using prescriptions for Defendants' opioids, and the Towns and their agents reasonably relied on these misrepresentations and omissions in covering and paying for Defendants' opioids for chronic pain.

292. Had the Towns known that Defendants misrepresented the risks, benefits, and evidence regarding the use of opioids for chronic pain, the Towns would have undertaken efforts to avoid the damages suffered.

293. By reason of Defendants' misrepresentations and omissions of material fact, the Towns suffered actual pecuniary damage. Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

294. As alleged herein, Defendants acted with actual malice, constituting conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud, entitling the Towns to an award of punitive damages.

WHEREFORE, the Municipal Plaintiffs demand judgment against the Manufacturer Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, plus interest, fees, and costs, and for any other relief that is just and proper.

## COUNT IV

### Intentional Misrepresentation
### (Against All Defendants)

295. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

296. As set forth herein, Defendants, individually and acting through their employees and agents, made misrepresentations and omissions of material facts inducing the purchase, administration, payment for, and consumption of opioids as set forth in detail above.

297. In doing so, Defendants have engaged in misrepresentations and knowing omissions of material fact.

298. By engaging in the acts, omissions, and practices alleged herein, Defendants omitted material facts that they had a duty to disclose by virtue of Defendants' other representations and by virtue of their positions in manufacturing, marketing, selling, and distributing dangerous opioid drugs.

299. Defendants' statements about the use of opioids to treat chronic pain and/or non-cancer pain conditions were false and not supported by, or were contrary to, the scientific evidence.

300. Further, Defendants' omissions, which were false and misleading, rendered even seemingly truthful statements about opioids false and misleading and likely to mislead prescribers and consumers in the Towns.

301. Defendants knew at the time that they made their misrepresentations and omissions that they were false.

302. Defendants intended that the Towns and the residents and /or employees or others affecting the Towns or spending time therein would rely on their misrepresentations and omissions, knew that the Towns and their residents would rely on their misrepresentations, and that such reliance would cause the Towns to suffer loss.

303. Healthcare providers and residents in the Towns and/or employees or others affecting the Towns or spending time therein reasonably relied on Defendants' misrepresentations and omissions in writing, filling, and using prescriptions for Defendants' opioids, and the Towns

and their agents reasonably relied on these misrepresentations and omissions in covering and paying for Defendants' opioids for chronic pain.

304. Had the Municipal Plaintiffs known of the Defendants' misrepresentations and false and tortious practices, they would have undertaken efforts to avoid payments of related claims or otherwise acted to mitigate or prevent damage.

305. By reason of their reliance on Defendants' misrepresentations and omissions of material fact, the Towns suffered actual pecuniary damage.

306. Defendants' conduct was accompanied by wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

307. As alleged herein, Defendants acted with actual malice, constituting conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud, entitling the Municipal Plaintiffs to an award of punitive damages.

WHEREFORE, the Municipal Plaintiffs demand judgment against all Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, plus interest, fees, and costs, and for any other relief that is just and proper.

## COUNT V

**Unjust Enrichment**
**(Against All Defendants)**

308. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

309. A claim for unjust enrichment in Maryland requires the defendant to be enriched by the receipt of a benefit; that the enrichment be at the expense of the plaintiff; and that it would be unjust to allow the defendant to retain the benefit.

310. Each Defendant was required to take reasonable steps to prevent the misuse, abuse, and over-prescription of opioids.

311. Rather than prevent or mitigate the widespread proliferation of opioids into the Towns, each Defendant instead chose to place its monetary interests first and each Defendant profited from prescription opioids sold in the Towns.

312. Each Defendant also failed to maintain effective controls against the unintended and illegal use of the prescription opioids it or he manufactured, distributed, or prescribed, again choosing instead to place its or his monetary interests first.

313. Each Defendant therefore received a benefit from the sale, distribution, or prescription of prescription opioids to and in the Towns, and these Defendants have been unjustly enriched at their expense.

314. As an expected and intended result of their wrongdoing as set forth in this Complaint, Defendants have profited and benefited from opioid sales which have ultimately caused damage to the Towns, as alleged above.

315. Defendants have been unjustly enriched at the expense of the Towns. It would be inequitable for Defendants to retain the profits and benefits they have reaped from the deceptive practices, misrepresentations, and unlawful conduct alleged herein.

WHEREFORE, Plaintiff demands judgment against all Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory damages, plus interest, fees, and costs, and for any other relief that is just and proper.

## COUNT VI

**Violations of Maryland False Claims Act, Md. Code Ann., Gen. Prov. §8-101, *et seq.***
**(Against Manufacturing Defendants Only)**

316. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

317. A person is liable under Maryland's prohibition on submission of false claims, Md. Code Ann., Gen. Prov. § 8-102(b), when that person:

(1) knowingly present[s] or cause[s] to be presented a false or fraudulent claim for payment or approval; or

(2) knowingly make[s], use[s], or cause[s] to be made or used a false record or statement material to a false or fraudulent claim.

318. Pursuant to Md. Code Ann., Gen. Prov. § 8-101(b)(1), a "claim" is defined as "a request or demand, under a contract or otherwise, for money or other property, whether or not the governmental entity has title to the money or property, that is:

(i) presented to an officer, employee, or agent of a governmental entity; or

(ii) made to a contractor, grantee, or another recipient, if the money or other property is to be spent or used on a governmental entity's behalf or to advance an interest of a governmental entity, and the governmental entity:

1. provides or has provided any portion of the money or other property requested or demanded; or

2. will reimburse the contractor, grantee, or other recipient for any portion of the money or other property that is requested or demanded.

319. A "governmental entity" includes "a municipal corporation." *Id.* § 8-101(e)(3). Moreover, "knowing" or "knowingly" explicitly does not require "proof of specific intent to defraud" but, instead, means that a person either "has actual knowledge that the information is false"; "acts in deliberate ignorance of the truth or falsity of the information"; or "acts in reckless disregard of the truth or falsity of the information." *Id.* at § 8-101(f)(1).

320. The Manufacturing Defendants' practices, as described herein in this Complaint, violated Md. Code Ann., Gen. Prov. § 8-102(b). The Manufacturing Defendants, through their deceptive marketing of opioids for long-term use to treat chronic pain, presented or caused to be presented false or fraudulent claims and knowingly used or caused to be used false statements to get false or fraudulent claims paid or approved by the Towns.

321. The Manufacturing Defendants knew, deliberately ignored, or recklessly disregarded, at the time of making or disseminating these statements, or causing such statements to be made and disseminated, that such statements were untrue, false, misleading, or unsupported by substantial and reliable scientific evidence, and were made for the purpose of inducing the Towns, through its employees and contractors, to pay for opioids for long-term treatment of chronic pain. Manufacturing Defendants also knew or should have known that their marketing and promotional efforts had the effect of creating untrue, false, and misleading impressions regarding the risks, benefits, superiority, and appropriateness of using opioids on a long-term basis to treat chronic pain.

322. The Manufacturing Defendants' scheme caused prescribers to write prescriptions for opioids to treat chronic pain on a long-term basis that were presented to the Towns' employee health and workers' compensation plans for payment. Prescribers and other health care providers, and/or other agents of the health plans and workers' compensation program, expressly or impliedly

certified to the Towns that the opioids prescribed were medically necessary and reasonably required to treat chronic pain because those persons were influenced by the false and misleading statements disseminated by Manufacturing Defendants through the deceptive marketing campaign described above in this Complaint. To the extent such prescribing patterns were considered customary or consistent with then-generally accepted medical standards, those standards were influenced, dictated, and ultimately corrupted by the Manufacturing Defendants' deceptive marketing.

323. The Manufacturing Defendants knew that, as a natural and foreseeable consequence of their actions, governments such as the Municipal Plaintiffs would necessarily end up paying for long-term prescriptions of opioids to treat chronic pain—prescriptions that were written and dispensed as a result of the Manufacturing Defendants' misrepresentations. Those misrepresentations—which were made and caused to be made by the Manufacturing Defendants—were material to the Municipal Plaintiffs' decision to pay the costs of long-term opioid therapy to treat chronic pain because they falsely assured that such treatment was medically necessary.

324. As a result, the Municipal Plaintiffs have paid significant sums for opioid prescriptions that were represented to them as being medically necessary. These prescriptions would not have been written or covered or reimbursed but for the Manufacturing Defendants' deceptive, fraudulent, and unlawful marketing practices.

325. The Towns have paid and will continue to pay consequential health care costs necessitated by the Manufacturing Defendants' deceptive, fraudulent, and unlawful marketing practices, in the form of drugs for persons who are physically dependent upon and addicted to opioids and in the form of treatment costs for those dealing with opioid use disorders, overdose, and other adverse effects.

326. As alleged herein, Defendants acted with actual malice, constituting conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud, entitling the Municipal Plaintiffs to an award of punitive damages.

WHEREFORE, the Municipal Plaintiffs demand judgment against the Manufacturing Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory and punitive damages, plus interest, fees and costs, and for any other relief that is just and proper.

## COUNT VII

**Violations of Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101, *et seq.***
**(Against Manufacturing Defendants Only)**

327. The Municipal Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as though fully alleged in this Cause of Action.

328. Maryland's Consumer Protection Act ("CPA") makes it unlawful for any business to engage in "any unfair or deceptive trade practice," including making any "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." Md. Code Ann., Com. Law §13-301(1). It also prohibits fraud-based deception, including "[d]eception, fraud, false pretense, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with" the promotion or sale of any consumer goods or services. *Id.* §13-301(9).

329. The CPA authorizes a private right of action for "any person...to recover for injury or loss sustained [] as the result of" an unfair or deceptive trade practice. Md. Code Ann., Com.

Law §13-408(a). "Person" is defined to include a "corporation…or any other legal or commercial entity." Md. Code Ann., Com. Law §13-101(h).

330. The Manufacturing Defendants are "persons" as defined in the CPA and are required to comply with the provisions of the CPA in their marketing, promotion, sale, and distribution of prescription drugs.

331. At all times relevant to this Complaint, the Manufacturing Defendants violated the CPA by engaging in the deceptive marketing and promotion of their products both by (1) making false and misleading statements which had the capacity, tendency, or effect of misleading consumers and by (2) making false representations and misleading omissions of material fact with the intent that consumers would rely on those representations. In particular, the Manufacturing Defendants engaged in deceptive marketing and promotion of their products by:

(1) making and disseminating false or misleading statements and other representations about the use of opioids to treat chronic pain which had the capacity, tendency, or effect of misleading customers;

(2) causing false or misleading statements about opioids to be made or disseminated;

(3) making statements to promote the use of opioids to treat chronic pain that omitted or concealed material facts; and

(4) failing to correct prior misrepresentation and omissions about the risks and benefits of opioids.

332. The Manufacturing Defendants' statements regarding the use of opioids on a long-term basis to treat chronic pain were not supported by, or were contrary to, substantial scientific evidence, as confirmed by recent pronouncements by regulators as well as widely accepted clinical guidelines regarding opioid therapy based on such evidence. Moreover, false and misleading

material omissions by Manufacturing Defendants rendered even seemingly truthful statements about opioids false and misleading because they were materially incomplete. At the time Manufacturing Defendants disseminated their false and misleading statements or caused such statements to be made or disseminated, they knowingly failed to include material facts regarding the risks and benefits of long-term use of opioids to treat chronic pain, and intended that recipients of their marketing messages would rely upon such omissions.

333. At all times relevant to this Complaint, Manufacturing Defendants violated Md. Comm. Law Code Ann. § 13-301 by making misrepresentations including but not limited to the following:

(1) Claiming or implying that opioids would improve patients' function and quality of life;

(2) Mischaracterizing the risk of opioid use disorders and abuse, including by stating or implying that "stead state" and abuse-deterrent properties meant that drugs were less likely to be addictive or abused, and that specific opioid drugs were less addictive or less likely to be abused than other opioids;

(3) Claiming or implying that addiction can be avoided or successfully managed through the use of screening and other tools;

(4) Promoting the misleading concept of pseudoaddiction and emphasizing the prevalence of dependence, thus obscuring the relationship between dependence and addiction and concealing the true risk of addiction;

(5) Claiming or implying that increasing the dose of opioids poses no significant additional risk to patients; and

(6) Misleadingly depicting the safety of opioids by minimizing their risks and adverse effects while emphasizing the risks of competing products, including NSAIDs and acetaminophen.

334. By reason of the Manufacturing Defendants' foregoing deception, misrepresentations, and omissions of material fact, Manufacturing Defendants obtained income, profits, and other benefits it would not otherwise have obtained.

335. By reason of that same conduct, the Towns incurred harm and were damaged in ways it would not otherwise have been, as described above.

WHEREFORE, the Municipal Plaintiffs demand judgment against the Manufacturing Defendants, jointly and severally, in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory damages, plus interest, fees and costs, and for any other relief that is just and proper.

Respectfully submitted,

Dated: March 4, 2020

Paul Mark Sandler
pms@shapirosher.com
Joel I. Sher
jis@shapirosher.com
Eric R. Harlan
erh@shapirosher.com
SHAPIRO SHER GUINOT & SANDLER, P.A.
250 West Pratt Street, Suite 2000
Baltimore, Maryland 21201
Telephone: (410) 385-4277
Facsimile: (410) 539 7611

*Counsel for Plaintiffs Town of Cottage City, The Town of Forest Heights, Town of North Brentwood, and The Town of Upper Marlboro*

**DEMAND FOR JURY TRIAL**

Pursuant to Maryland Rule 2-325(a), Plaintiffs hereby demand a trial by jury on all issues.

Respectfully submitted,

Dated: March 4, 2020

Paul Mark Sandler
pms@shapirosher.com
Joel I. Sher
jis@shapirosher.com
Eric R. Harlan
erh@shapirosher.com
SHAPIRO SHER GUINOT & SANDLER, P.A.
250 West Pratt Street, Suite 2000
Baltimore, Maryland 21201
Telephone: (410) 385-4277
Facsimile: (410) 539 7611